## J. I. WARD, Admr., v. SOUTHERN RAILWAY COMPANY, et al.

Eastern Section.   Oct. .29, 1932.

Writ of Certiorari denied by Supreme Court, January 21, 1933.

Johnson & Cox, of Knoxville, attorneys for plaintiff in error.
Cates, Smith & Long, of Knoxville, attorneys for defendants in error.

R. B. CASSELL, Sp. J. This case is before the Court on appeal from a judgment of the Circuit Judge of Knox County dismissing the suit on a motion for peremptory instructions offered by the defendants, Southern Railway Company, Plumlee, the engineer, and overruling a motion for a new trial to which exception was taken by the plaintiff.

The facts as alleged in the declaration and upon which the suit was based are, briefly stated, that one Lynton Ward, deceased, a boy of 18 years of age, an employee of the Railway Company attempted on July 24, 1929, to pass through the switch yards of the defendant Railway Company, located east of Knoxville, and known as the John Sevier yards. In passing through the yards, the plaintiff's intestate attempted to pass between two coal cars then standing on one of a number of tracks of the defendant company and in passing between said cars, when the defendant, Southern Railway Company, acting by and through its engineer, one J. A. Plumlee, also a defendant to the suit, without warning, negligently, carelessly, unlawfully and in violation of its custom, shoved certain railroad cars together by means of an engine controlled by said Plumlee, said Lynton Ward was killed. Judgment was sought for Fifty Thousand Dollars ($50,000) as damages, and it is stated that Five Hundred Dollars ($500) was incurred as expenses in the burial of Lynton Ward. Motion for a new trial was made by the plaintiff and in due course was overruled and the case is now before this court for consideration on an appeal in the nature of a writ of error and the following errors are assigned by the plaintiff in error.

"Comes the plaintiff, J. I. Ward, Administrator of Lynton Ward, deceased, and says that the learned trial Court was in error in this case:

"(1) In granting and allowing the motion of the defendant to direct a verdict in favor of the defendant in this case.

"(2) In directing a verdict in favor of the defendant upon its motion. (Transcript p. 13.)

"Wherefore, the plaintiff says that the Court erred in directing the jury to find a verdict in favor of the defendant, and against the plaintiff in the above styled case, which error should be corrected by this Honorable Court, and the case remanded to the trial Court for trial, in accordance with the correct rules of law."

The trial judge, in sustaining the motion for peremptory instructions made at the close of the plaintiff's testimony, stated that he was of the opinion that the accident happened in the switch yards of the company and that it did not appear whether the contact between the two cars which killed this young man was caused by the

engineer or by the cars moving by gravity or by the jar of the track resulting from one of these causes or some other cause and that this was left to conjecture and if the plaintiff's interstate's negligence was not the proximate and sole cause of his injuries and death it was seemingly certain that he was guilty of such proximate concurring negligence as to bar the recovery as to law.

The facts in the case are substantially these: The Southern Railway Company maintains what is known as the John Sevier Yards east of Knoxville, which yards are used for switching purposes. They are surrounded by a high fence and occupy a large tract of land and upon this land adjoining the switchyards are several tenant houses, which the company rents to its employees, among others the plaintiff, J. I. Ward. It further appears that the deceased, an 18 year old boy, was also employed by the defendant, but upon the day he was killed he was not working but in company with another young man had started to cross the tracks of the switch yard to go upon an errand and in order to further proceed upon his journey the plaintiff's intestate attempted to go between two railroad cars standing on a track leading to defendant's coal chute, which cars were something like a foot or eighteen inches apart, and in some manner the cars came together, the plaintiff's intestate was crushed and was instantly killed. It does not appear from the record affirmatively, or at all, just what caused these cars to come together, whether they were shoved together by an engine attached to other cars upon the same track or whether they were jarred by movement of other cars in the yards or just what started one of the cars to moving so that it would strike the other.

It appears from the record that the switch yards were some three miles in length and fully a quarter of a mile or more wide and contained a large number of tracks, some twenty or more, all of which were used for switching purposes, the main tracks being on the outside of the yards. The plaintiff, father of the boy killed, had been working for the railroad at this place for a number of years, and lived inside of the fence inclosing the yards in a house belonging to the defendant Railway Company. The boy, as well as the plaintiff, was familiar with the physical conditions of the yards and familiar also with the movement of the cars upon these yards. It seems that the intestate, as well as the plaintiff, had crossed previously a number of times at the place where the plaintiff's intestate was killed, and he had frequently warned his father about being careful in climbing over these cars, and the father had likewise warned the boy. It seems, however, that part of this testimony was excluded by the trial court (Tr. p. 50) as appears in the record, but the same facts further appear in the record elsewhere. As stated above, it appears that the

boy had crossed at this place a number of times, sometimes by himself and sometimes with his father and that he was therefore very familiar with both the location of the tracks and the movement of the cars on the tracks.

It appears from the evidence that the house of the plaintiff's intestate was located a considerable distance west of the place of the accident and that between his house and the place of the accident the railway had provided for use of the employees a plank walk across some car repair tracks upon which cars moved very seldom; there was also across other tracks at this place for the employees' use, an overhead foot bridge as well as a foot underpass. So it is that the railway had provided a safe way for its employees to cross the switch yards, and there was no necessity for any employee, though he lived on the north side of the tracks to cross the tracks at the place where Ward was killed even though his desire was to go to the store or the highway. If he crossed at the place of the accident, it was for the purpose of convenience, and not of necessity.

The only eye witness to the accident, Robert Daniels, a boy of the same age as the plaintiff's intestate, had started with the deceased across the tracks upon an errand to procure some missing part of a hay frame and while Daniels attempted to climb up over the cars, the deceased went around him in an attempt to pass between the cars, where he was caught by the cars coming together and was crushed. It appears from the testimony of witness Daniels that before they attempted to cross the tracks at the place they looked and did not see an engine, though just whether they could see any engine had one been attached to a string of cars is not definitely determined on account of a curve in the track at this place. It appears that the cars upon this part of the tracks were on a line that leads to the coal chute and were frequently moved by gravity and just what caused this car to move at this time does not appear from the record as is before stated. The jury might have conjectured that the car was moved by an engine or that it was moved by gravity. And further, it appears from the record that it was the custom for the train crew to couple up the cars when the engine came in to take them out, and when this was done usually some switchman would be along the tracks to do this work. Likewise, it appears that if this movement of the cars was caused by an engine, that the cars would have been bumped together in coupling; the eye witness, Robert Daniels, stated that he did not hear any noise of such striking or bumping at the time of or before the accident. If there was any engine attached to a string of cars at the time the boy was killed Robert Daniels does not know where it was located though he did state that he saw an engine a few minutes after the accident, but where it was at the

time of the accident he does not know nor does he identify the track upon which the engine was moving.

Daniels knew and likewise the intestate knew that this place was a dangerous one.

The following excerpt taken from the testimony of Daniels shows this to be true:

"Q. Now when you got here to the path you all intended to come down, you didn't look there to see if there was any engines working cars on that coal chute track, did you? A. No, sir, I didn't look on top of the bank.

"Q. When you got half way down, you didn't look to see if there was any engines working on either end of that train, did you? A. No, sir.

"Q. If you had looked up here on top of the bank, you could have seen an engine, if there had been one down there, all the way down to the overhead bridge, couldn't you? A. Yes, sir.

"Q. When you got half way down that bank if you had looked back, you could have seen an engine away down here past the curve, couldn't you, if there had been one there? A. Yes, sir.

"Q. But you didn't look at that place? A. No, sir.

"Q. How close was he behind you right at that place? A. Don't know.

"Q. And you never looked to see if you could see an engine anywhere? A. Yes, sir.

"Q. You knew though that an engine was liable to couple up those cars any minute? A. Yes, sir.

"Q. And you knew a car was liable to be turned loose at the coal chute, and kicked in at any minute? A. Yes, sir.

"Q. You knew these cars standing open just 18 inches or two feet, if you went in between them they might be shifted together any second? A. Yes, sir.

"Q. You weren't expecting to find anybody there to flag you to keep you from going through? A. No.

"Q. You weren't looking for anybody for that purpose were you, you simply came down there along the track, and stopped but you couldn't see very far? A. No.

"Q. You took hold of the car and started to step on the end of it? A. Yes, sir.

"Q. Is that on the dead wood? A. No, I started to swing over on the drawhead and then on across.

"Q. What were you going across that way for? A. To get the hay frame from Dan Green.

"Q. Why didn't you walk between the drawheads instead of swinging across? A. Didn't like to.

"Q. Why? A. Just didn't.

"Q. It is dangerous, isn't it? A. Yes, sir.

"Q. And so you took the safer way, if there is a safe way at all, less dangerous, we will call it, you took the less dangerous way of swinging up on the drawhead to get across? A. Yes, sir.

"Q. But before you had time to swing up there, those cars closed in? A. Yes, sir.

"Q. And in the meantime this boy had walked right by you, and started through, hadn't he? A. Yes, sir.

"Q. He didn't try to swing up on the drawheads, did he? A. Never saw him.

"Q. Didn't try to climb up on the car did he? A. No, sir.

"Q. You noticed him doing this, didn't you, that when he went through there, that he turned sidewise to get through there between those knuckles or couplers? A. Yes, sir.

"Q. He turned sidewise to step through those couplers? A. Yes, sir.

"Q. And just as he got in between, the cars closed up, and he was caught? A. Yes, sir.

"Q. And that is all you know about it? A. Yes, sir."

It is further shown in the testimony, as before stated, that the Railway had provided an underpass for its employees some distance east of the place of the accident and while its employees frequently crossed the track at the place of, or near the place of, the accident in order to reach the store of Mr. Sands or highway yet they did not have to cross at the place of the accident or at other portions of the yards near the accident, and, of course, if they did, it was at their own risk. Witness Daniels further testified that it was dangerous to cross the track at the place where he and the intestate attempted to cross on the day of the accident. Before reaching the place of the accident, the intestate with Daniels had gone around a number of cars on other switch tracks, and it further appears that when they started down to the track the witness did not stop to see if there was any engine switching there as his view of any engine if it was on the track in question was unobstructed and when he got half way down he did not stop to look tho he could have seen any engine from that position, and further it appears that this witness knew (as he states), and presumably the intestate knew, that an engine was liable to come in there and couple up those cars any minute or that a car was liable to be turned loose at the coal chute at any minute and kicked in against the car that killed the intestate. The witness, Daniels, stated that the deceased had to turn sidewise to start through the couplers as the aperture between the cars was very small. This witness did not attempt himself to go through between the cars, but started to

climb over the cars and stated that the deceased went around him in order to go between the cars.

Although it is claimed by the plaintiff in error that the Railway Company left a space or spaces between the cars on this coal track and that these places were opposite paths which led to the store and highway, we do not think the evidence as a whole sustains this contention. The openings were not at regular intervals but were openings left by the switchmen in shunting the cars to and from the coal chute, and by those cars moving by gravity, and the spaces between these cars were not uniform nor were they always opposite the paths made by the employees in going to and from the tracks in the yards.

From the testimony of J. I. Ward, plaintiff in the case, it is clearly shown that both he and the intestate knew that these cars, which the boy attempted to pass between when he was killed, might be bumped together at any minute. In the transcript at pages 49 and 50 the following portions of his testimony is literally quoted:

"Q. You knew cars were liable to be knocked together at any time? A. Yes.

"Q. You expected them to be bumped together? A. Yes.

"Q. And you expected standing cars, when they were not coupled, to be bumped together, didn't you, and your boy knew that, didn't he? A. Sure he knew it.

"Q. Knew all about that? A. He knew it."

So it thus affirmatively appears that in addition to what has been stated, the deceased knew of the dangerous undertaking which he was attempting to carry out when he started across the track.

As before stated, the case is before the Court on the question of whether or not the trial judge committed an error in sustaining the motion for peremptory instructions and in overruling the motion for a new trial and in consideration of this question this Court must take cognizance of the fact that the law in Tennessee is well settled that the trial judge has the right in jury cases to sustain a motion for peremptory instructions and take the case away from the jury when there is no controversy as to any material fact that would be determinative of the case. In passing on this question, however, it should not be determined that the case should be submitted to a jury when there is a mere spark or glimmer of evidence, this rule requires when there is some evidence of a material or substantial nature to support the plaintiff's case that the Court will not undertake to determine its comparative value or weight of the evidence, but will leave the determination of the conflict to the jury. Brenizer v. Nashville, Chattanooga & St. Louis Ry., 156 Tenn., 479, 3 S. W. (2d), 1053; Greenlaw v. Ry., 114 Tenn., 187, 86 S. W., 1072; Tyrus v. Ry., 114 Tenn., 579, 86 S. W., 1074.

In the case of Greenlaw v. Ry., supra, it is made the duty of the trial judge to direct a verdict for the defendant where, upon consideration of the entire evidence, he is of the opinion that there is no material evidence to be submitted to the jury and his action in submitting the case to the jury when the merits of the case has been reached will not be reversed.

With these principles of law before us as to this question of practice, which as before stated are well settled in Tennessee, we now determine the law applicable to the facts of the case. As stated previously, the accident occurred in the John Sevier yards, which are large yards; it is well settled that the statutory precautions do not apply to switch yards. Todd v. Ry., 135 Tenn., 100, 185 S. W., 62. This being true the case must be governed by the principles of the common law, which, of course, are familiar to the profession in this State. Adcock v. Ry., 3 Higgins, 128-137-138; Patton v. Ry., 89 Tenn., 370, 15 S. W., 919; Ry. v. Pugh, 95 Tenn., 421, 32 S. W., 311.

This being the law applicable to the instant case, the question arises that even conceding the defendant railway was guilty of some negligence in not following an alleged custom of giving notice as to when an engine was to go in upon this coal track to do switching—if such were a fact—we are irresistibly drawn to the conclusion that the prime and proximate cause of this injury was the act of the plaintiff's intestate, a person familiar with the danger, in going in between the cars standing on the track when they were likely to move at any time by gravity, by another car kicking it, or by an engine and such being the case we believe that the act of the boy going into such a dangerous place was gross negligence and proximately contributed to the injury and between the cars at the time and place of the accident, neither can one for which there can be no liability. Then again, it is not shown in the record by any material evidence whether the cars were moved by the defendant, Plumlee, the engineer, or by gravity, and such being our view of the case upon consideration of all the evidence, we do not believe it to be the law in Tennessee that the jury should be allowed to conjecture or to speculate as to just what caused these cars to move and kill the intestate. "In no case where there is an absence of proof of physical agencies doing the harm should the court permit the jury to speculate as to the party responsible for the injury suffered." Fitzgerald v. Ry. Co., 6 L. R. A. (N. S.), 361 n.; Pryor v. Ry. Co., 2 Higgins, 203.

"If the employee is unable to produce sufficient proof of responsibility for the accident it is a misfortune of which the court cannot relieve him." Patton v. Railroad, 179 U. S., 664.

In this last mentioned case the Supreme Court of the United States used the following language:

"And where the testimony leaves the matter uncertain and shows that any one of half a dozen things may have brought about the injury, for some of which the employer is responsible and for some of which he is not, it is not for the jury to guess between these half a dozen causes and find that the negligence of the employer was the real cause, when there is no satisfactory foundation in the testimony for that conclusion."

Such speculation or conjecture is not permitted by our decisions and the trial judge was correct in not permitting the case to go to the jury. Buckeye Cotton Oil Co. v. Campagna, 146 Tenn., 395-396, 242 S. W., 646.

If it be conceded that material evidence exists in the record which tends to establish the fact that it was the custom of the railroad authorities to give notice when a train was to go in upon the track and move these cars and that it violated the custom in this instant case: still there could not be any recovery because of the gross negligence of the intestate in going there when concurrent acts of negligence on the part of the plaintiff and defendant exist. We find that there were such concurrent acts of negligence as were the prime and proximate causes of the accident in this case.

For these reasons, we are constrained to affirm the action of the trial judge in sustaining the motion for peremptory instructions and in taking the case away from the jury.

The judgment of the lower court is affirmed with costs.

Portrum and Thompson, JJ., concur.