STATE, for Use of LAY et al., v. CLYMER et al. (three cases).—182 S. W. (2d) 425.

Eastern Section. March 10, 1943.

Petition for Certiorari denied by Supreme Court, October 16, 1943.

520

Jennings, O'Neil & Jarvis, of Knoxville, for plaintiffs in error.

Ernest F. Smith, of Nashville, for Clymer and Welch.

Trabue, Hume, Davis & Gale, of Nashville, for Western Casualty & Surety Co.

Poore, Kramer & Overton, of Knoxville, for Fidelity & Casualty Co., of New York.

KETCHUM, J. These are three separate actions brought by the state for the use of William Foster Lay, John Bullard, administrator of the estate of Thomas Bullard, deceased, and Clarence William Hill, against W. W. Clymer, District Mine Inspector, and Joseph Allison Welch, Chief Mine Inspector, and the sureties on their official bonds, to recover for personal injuries

sustained by the said William Foster Lay and Clarence William Hill, and for the alleged wrongful death of Thomas Bullard, in an explosion in Peabody Mine No. 4, in Campbell County Tennessee, on May 4, 1940. All three cases grew out of the same explosion, and for convenience were tried before the same jury. At the close of the plaintiffs' proof a motion was made for a peremptory instruction in behalf of the defendants, which motion was denied and exceptions taken; the defendants then rested and introduced no proof in their behalf, but renewed their motion for a peremptory instruction, which was granted, and the plaintiffs' suits dismissed. The plaintiffs then seasonably filed their motions for a new trial, which motions were overruled and they have appealed in error to this court.

The declarations are in a single count and are substantially identical in form. It was alleged that the plaintiffs William Foster Lay and Clarence William Hill were injured, and that Thomas Bullard was killed, by said explosion; that the explosion was caused "from a combination of bad ventilation and accumulation of dust, and the general dilapidated condition of the mine, the lack of brattices, the lack of ventilating fans, the lack of an airway, and due to the presence of poisonous and noxious gases."

It was alleged that the defendant Clymer was the District Mine Inspector of the district in which said mine was located, and the defendant Thomas Allison Welch was the Chief Mine Inspector, duly appointed and qualified as such in the manner required by the statute, and that the two surety company defendants were the sureties on their official bonds; that the condition of said bonds was that the said principals "well and truly discharge the duties of the office or employment to which he (they)

had been appointed." The duties of said Clymer as District Mine Inspector, and Welch as Chief Mine Inspector, respectively, as fixed by the statutes, were set out at length and in detail, and it was alleged that they had breached the condition of their bonds in failing to inspect said mine at least once in every sixty days, and in failing to put notices at the entrance to said mine warning the workers of the unsafe condition thereof, and in failing to require the owners or operators of said mine to repair and place it in safe condition, all as required by the statutes which are referred to at length and in detail; and that but for their neglect of their duties in this regard said mine would not have become unsafe and dangerous for the workers therein and said explosion would not have occurred; and that under the statute referred to they and their sureties on their official bonds were liable to the plaintiffs for the injuries sustained by Lay and Hill and for the death of Bullard.

The defendant filed pleas of not guilty, nil debet and non assumpsit.

The statutory provisions with which we are here concerned are found in chapter 24 of Title 12 of the Code. Title 12 relates to the police powers, and chapter 24 of said title relates to the regulation and inspection of mines; there are 100 sections in this chapter, beginning with section 5539 and ending with section 5638, and all of said sections were enacted "for the purpose of greater protection to the life and health of persons, employed in and around the mines," etc. The pertinent sections are referred to in the declarations and will be referred to herein as we deem necessary.

Section 5539 provides that the governor shall appoint one chief mine inspector "who, with the approval of the governor, shall appoint district mine inspectors."

Section 5544 provides that the chief mine inspector and the district inspectors shall give bonds, to be approved by the governor, conditioned "that they will faithfully discharge the duties of their offices" and make oath that they will faithfully and impartially discharge the duties of their respective offices, etc.

Section 5547 makes it the duty of the district inspectors "thoroughly and carefully to examine and inspect each mine in their respective districts . . . and see that every provision of this chapter is strictly observed, by the owner, agent and employee."

Section 5549 provides that the (district) inspectors shall make an accurate report of the mines inspected, setting out the details of their inspection and forward said reports to the chief mine inspector, monthly.

Section 5550 requires the chief mine inspector to make a complete record of such inspections and include them in his annual report to the governor.

Sections 5551 and 5552 require the district inspectors immediately to "notify the chief inspector, the owner, agent, or superintendent of any mine found to be in a dangerous condition," etc., and "on receipt of same, the chief inspector shall make a thorough personal examination of the mines at the earliest practicable time," etc.; and if the chief inspector then finds "dangerous conditions to exist in the mines, he shall notify the employees of the mine by posting notice near the entrance to the mine . . . and also notify the operator, agent, foreman, or superintendent of such mine as to the dangerous conditions found in the mine."

Section 5553 provides that if deemed necessary the chief inspector shall apply to a court of equity for an injunction, etc.

Section 5554 provides that if the said chief or district inspector in examining said mines find them to be unsafe or dangerous, "or in their opinion to threaten or tend to the bodily injury of any person," then they shall notify such person, and shall notify the owner or operator of the same to rectify such dangerous conditions.

Section 5555 makes it the duty of the chief inspector to bring suits when necessary to enforce the observance of the provisions of these statutes.

By section 5558 the chief inspector is authorized "with the consent of the governor, to remove a district inspector for a sufficient cause. Any malfeasance in office, disregard for rules, drunkenness or immoral conduct shall constitute a sufficient cause."

Section 5559 makes it the duty of the chief inspector to render such assistance to the district inspectors as the circumstances may require, and to make such personal inspections as he may deem necessary, etc.

Other sections relate to keeping of records, the classification of the various types of mines, and when and how they shall be inspected. Class B mines, such as Peabody No. 4, are those that are liable to dust explosions, and are required to be examined every sixty days or oftener. Sec. 5569.

█ There was evidence to show the following facts, from which it is very earnestly argued that the trial judge erred in granting the peremptory instruction in favor of the defendants:

(1) That the Peabody No. 4 mine in which the explosion occurred was in bad condition, that it was dusty, poorly ventilated, and in bad condition generally; and that Jeff Gothard, the mine foreman, quit his job there in November, 1939, on account of the unsafe condition

of the mine, and notified the operators that this was the reason he was leaving.

(2) That the explosion was caused by the accumulation of dust, the lack of ventilation and bad air in the working places in the mine.

(3) That the plaintiffs were miners working in the mines and therefore entitled to the protection of the laws relating to the inspection and regulation of mines.

(4) That Clymer, the district inspector, had made no inspection of this mine for many months, and certainly not within the sixty day period immediately preceding the date of the explosion. The finding upon this feature of the case is based upon the testimony of witnesses who worked in and about the mine and who said they had not seen him there, and of one witness, Gothard, who rode down the hill with him from the Log Mountain mine and called his attention to the bad condition of the No. 4 mine, to which Clymer replied that he had a good man up there and would have it straightened up. It is insisted by the defendants that this is evidence of a purely negative character, and was not positive proof that he did not inspect the mine within the sixty day period; but we think it was evidence sufficient to have required the submission of the case to the jury on this issue if it was a determinative issue in the case.

The plaintiffs also insist that the proof warranted the finding that Welch, the chief mining inspector, knew or was charged with the knowledge of the dereliction of Clymer, the district mining inspector, because no reports of the inspection of the mine in question were ever filed; or at least the question of his knowledge of Clymer's failure to inspect the mine should have been submitted to the jury. The difficulty about this contention is that it assumes that Clymer did not make any report about

the condition of the mine. This is an unwarranted assumption because there is no proof that such notices were not sent in as required by the statute (Code, sec. 5549), and in the absence of proof to the contrary the law presumes that they were sent in.

In Stiner v. Powells Valley Hardware Co., 168 Tenn. 99, 103, 75 S. W. (2d) 406, 407, it was said that "There is always a presumption, in the absence of any showing to the contrary, that a public official has performed the duties imposed upon him by law," and it was accordingly held in that case that it would be presumed that the chancellor had filed a written finding of facts as required by code section 10620, although no such finding appeared in the transcript.

■ It is further contended by the plaintiffs on this feature of the case that "the inference to be drawn from the silence (failure) of either of the defendants to testify is that no inspection reports were ever sent in; in fact, none were sent in unless they were fraudulently prepared by Clymer, because he never made any inspection." No adverse inference is to be drawn against the defendants on their motion for a peremptory instruction because of their failure to go on the stand to deny or explain their alleged dereliction of duty when they were charged with a failure to perform the duties of their office. The law presumes that they did their duty and the burden was on the plaintiffs to overcome that presumption.

■ We find no proof in the record that Clymer, the district inspector, ever failed to make any report to the chief inspector about the condition of this mine, or that he ever made a report that it was in a dangerous and unsafe condition; and until it was reported to him that the mine was unsafe and dangerous it was not incumbent upon Welch, the chief inspector, to make any personal

inspection, or to take any steps to correct such unsafe and dangerous condition. Code sec. 5552. The declaration alleges that Welch, the chief inspector, had actual knowledge of the dangerous and unsafe condition of the mine for a long time prior to the explosion, and took no steps to remedy the situation. There is no evidence to support this averment of the declaration.

The only other charge against Welch upon which liability is sought to be predicated is that he negligently permitted Clymer to fail to inspect the mine and to properly report its dangerous and unsafe condition. But as we have already pointed out there is no testimony that Clymer failed to make some report about this mine to the chief inspector. There is a presumption made that he did do so. There is a suggestion made that he may have made a false report; but, even if he did, the chief inspector had a right to rely upon it. For as we have already pointed out until and unless the dangerous and unsafe condition of the mine was called to the attention of the chief inspector he was not required to take any action. The real complaint of the plaintiffs is that Clymer, the district inspector, did not inspect the mine and report its dangerous and unsafe condition to the chief inspector, and until he had done so, and the chief inspector had failed to make his personal inspection as required by code section 5552, there was no liability on his part. In Johnson City Board of Education v. Ray, 154 Tenn. 179, 183, 289 S. W. 502, 503, it was said that ''ordinarily, a person cannot be held responsible for that which he is not duty bound to perform.''

It is to be borne in mind that these suits are not predicated upon any willful or malicious or corrupt act on the part of the chief inspector, but are predicated upon

a simple act of negligence in that he failed, through carelessness or neglect, to force the dictrict mine inspector Clymer to inspect the mine and report on its condition. While the statute makes it the duty of the district inspectors to "notify the chief inspector, the owner, agent, or superintendent of any mine found to be in a dangerous condition," we find nothing in the statute that gives the chief inspector any authority over the district inspectors in the performance of their duties. Code section 5551. So it is doubtful whether Welch had any authority to compel Clymer to inspect the mine and report to him as to its condition. To say the least, we do not think he can be held to have been guilty of negligence in failing to do so in the absence of any evidence that he had any knowledge or reason to suspect that the mine was in a dangerous condition.

We think that under the proof offered the peremptory instruction was properly granted so far as Welch and his surety were concerned.

But the duties of the district inspectors are of an entirely different character. It is specifically made their duty "thoroughly and carefully to examine and inspect each mine in their respective districts" and to "carefully examine into the workings and conditions of the mines as to ventilation, drainage, general security to health and life, circulation and condition of the air in the mines, doors, brattices, . . . for the presence of dust in deposit on bottom, timbers, roadways, and working places throughout the mines, and for the presence of poisonous and noxious gases" and many other duties. Code secs. 5547, 5548. They are required to keep accurate records of examinations of the mines, the dates when made, the condition in which the mines are found, with full details etc., which records "shall be forwarded to the chief mine

inspector's office on or before the third day of each month, or as the chief mine inspector may require"; and shall immediately notify the chief inspector, the owner, agent or superintendent of any mine found to be in a dangerous condition, etc. Code secs. 5549, 5551.

By section 5567 "the maximum period that shall occur between inspections of each mine in this state and the minimum quantity of fresh air that shall be supplied to each person and each animal" is to be determined according to the classification of the mines; and by section 5569, Class B mines, in which classification Peabody mine No. 4 falls, are defined as including mines that are dry and dusty and liable to dust explosions, and are required to be inspected "at least once every sixty days, or oftener, to determine whether the mine is being operated according to the restrictions governing mines of this class."

It will be noted that the duties of the district inspectors with respect to all of the above matters are absolute, imperative and ministerial, and not merely discretionary. They are duties which are assumed by them for "the greater protection of the life and health of persons employed in and about the mines" and they are required to take an oath "that they will faithfully and impartially" discharge their duties to the best of their ability, and to execute a bond for 15,000 dollars to the state, conditioned "that they will faithfully discharge the duties of their office."

And for failure to discharge their duties they are civilly responsible to the parties injured; and any party aggrieved may maintain an action upon his bond to recover the damages sustained by him. Code, sec. 8621. State v. McClellan, 113 Tenn. 616, 619, 85 S. W. 267, 268, 3 Ann. Cas. 992.

In this case, which was a suit against a county register and his surety for the damages sustained by the complainant by reason of the failure of the register to record correctly a deed filed with him for registration, the court said: ·

"The liability of a public officer and his sureties for damages, the proximate result of a breach of ministerial duties of this character, is absolute. No question of willfulness or negligence is involved, and innocent mistake or inadvertence affords no excuse. This seems to be well-settled law."

And quoting from Mechem on Public Officers, a standard authority, the court continues:

"It is settled that where the law imposes upon a public officer the performance of ministerial duties in which a private individual has a special and direct interest, the officer will be liable to such individual for any injury he may proximately sustain in consequence of the failure or neglect of the officer either to perform the duty at all or to perform it properly.

"In such a case the officer is liable as well for nonfeasance as for misfeasance or malfeasance."

In Hale v. Johnston, 140 Tenn. 182, 197, 203 S. W. 949, 952, the court said:

"The authorities seem to be in accord to the effect that public officials, who owe the performance of a ministerial duty to a particular individual, are liable to one injured as the proximate result of their nonfeasance of misfeasance . . . of such duty. Where the duty is absolute, certain, and imperative, and is simply ministerial, the officer is liable in demages to any one specially injured, either by omitting to perform the task or by performing it negligently or unskillfully."

Hale and Duncan were county commissioners of Shelby County and as such were responsible for the humane treatment of prisoners at the county workhouse and on the county roads. They were sued for the death of a prisoner working on a county road which resulted from a cruel beating by a guard. In holding that they were liable, although the punishment of the prisoner was not inflicted with their knowledge or by their direction, it was further said:

"Under these authorities, we consider it wholly immaterial whether it be considered that the negligence of the defendants Hale and Duncan was misfeasance or nonfeasance. They had entered upon the discharge of their duties as county commissioners, and they owed an active duty, both to the public and to the inmates of the county workhouse, to see that the statutory mandate was carried out. Inaction would none the less be a misfeasance because they had assumed the discharge of the statutory duties, and failure to perform a positive duty is a positive wrong. If one to whom the duty is individually owed suffers an injury as the proximate result of the failure to perform it, no reason can be perceived why the defaulting official should not be liable in damages."

The court held that the duty of the county commissioners to see that the prisoners were humanely treated was a ministerial duty although the statute involved judgment and discretion in working out the details by which the obligation imposed upon them was to be discharged, because the statute imposed upon them a plain and manifest duty, the doing of which was not in their discretion. To quote again:

"It (the duty) is positive, absolute, and mandatory. The commissioners cannot cast it off by willful neglect, or by the delegation of their duties to others. The hu-

manity of the law would be greatly impaired if it should be held that such a duty is discretionary with the defendants.''

■ The argument is made with much earnestness that the negligence of Clymer, if any, is, at most, that of nonfeasance for which there is no liability. The answer to this contention is that under the modern authorities the distinction between liability of an agent in tort for acts of nonfeasance and those of misfeasance and malfeasance, has practically been abandoned, and the courts are generally in agreement in holding that an agent is liable to third persons resulting from the violation of a duty that the agent owes to the third person, regardless of whether the violation be one of nonfeasance, misfeasance or of malfeasance. As said by Chief Justice Green in Scott v. Burton, 173 Tenn. 147, 151, 114 S. W. (2d) 956, 957:

''This distinction between the agent's liability in tort for his acts of nonfeasance on the one hand and his acts of malfeasance or misfeasance on the other has been largely abandoned in modern decisions and is repudiated by the American Law Institute. Restatement, Agency, section 352 et seq., and cases collected in notes 20 A. L. R. 99, and 99 A. L. R. 408. Under the latter rule the liability of an agent to a third person is tested by his duty to such third person. If the agent is guilty of a breach of duty to a third person, he is held liable whether that breach of duty be one of omission or commission, whether it be nonfeasance, malfeasance, or misfeasance.''

To the same effect, see 2 Am. Jur., ''Agency'', sec. 325, p. 256.

And as applicable to the liability of Clymer to the plaintiffs under the statute for the protection of persons work-

ing in mines, the following comment from Restatement, "Agency", vol. 2, sec. 354, is pertinent:

"If such protection is essential to the safety of such others, and the agent at the time he undertakes to act should realize this, his intervention between the principal and others by his assumption of the duty to the principal creates a duty to the others to use care either to perform the service, or to see that no harm results from his failure to do so. This is particularly so if the other has entered into an undertaking, dangerous unless protective means are used, relying upon the principal to give protection, . . . Likewise persons employed to inspect machinery and report upon defects in order that it may not cause harm to others have duties to those likely to be injured by it, not only to be careful in the inspection which is made but to make an inspection."

The fact cannot be ignored that the statute imposed a positive duty upon Clymer to inspect the mine for the safety and protection of the plaintiffs who were working in the mines. If he failed or neglected to perform this duty, this was actionable negligence for which he would be liable to the plaintiffs if his failure to inspect the mine was the proximate cause of the explosion and their consequent injuries.

In Adams v. Cumberland Inn Company, 117 Tenn. 470, 477, 101 S. W. 428, 430, it was held that the Inn Company was liable to a guest who was injured in a fire by reason of its failure to maintain fire escapes, or ropes and ladders as required by statute and a municipal ordinance. The rule applicable in such cases is stated by Justice Shields in the following language:

"Generally speaking, the violation of a rule of the common law, a statute, or an ordinance of a municipality, or the failure to discharge and perform a duty so imposed

in the interest of the public, is actionable negligence, and any one coming within the protection of the law, or intended to be benefited by it, who suffers an injury peculiar to himself, the proximate cause of which is the violation or nonperformance of the law, may maintain an action against the offender for the injuries sustained by him.'' (Citing many cases.)

And in Lively v. American Zinc Co., 137 Tenn. 261, 266, 191 S. W. 975, 977, Mr. Chief Justice Neil after referring to certain provisions of the statute we now have under consideration, said:

''The duty to comply with such and similarly specific provisions of a statute designed as precautions against accidents and injuries is absolute, and they cannot be satisfied by a mere approximation, or by the exercise of 'reasonable diligence,' or 'ordinary care' in an effort to comply. Sundry applications of the principle may be found in the following cases: Deserant v. Cerillos Coal [R.] Co., 178 U. S. [409], 410, 20 S. Ct. 967, 44 L. Ed. 1127; Chicago B. & Q. R. Co. v. United States, 220 U. S. 559, 31 S. Ct. 612, 55 L. Ed. 582; McDaniels v. Royle Mining Co., 110 Mo. App. 706, 85 S. W. 679; Little v. Norton Coal Co., 83 Kan. 232, 109 P. 768.''

But, it is said that granting that Clymer did not inspect the mine as it was his duty to do, and that he was negligent in the performance of the positive and mandatory duty that he owed the plaintiffs, still it is not shown that his negligence in this regard was the proximate cause of the accident, for the reason that no causal connection is shown between his negligence and the injuries sustained by the plaintiffs. We cannot agree to this. There is proof that a large amount of dust had accumulated on the floor and timbers throughout the mine, that there were no brattices where they were necessary, that there were

no fans, and that the ventilation and circulation of the air throughout the mine was inadequate, all of which matters are said to furnish evidence of a dangerous and unsafe condition in the mine. Assuming that such a condition existed, as Gothard testified it did exist as far back as November, 1939, which was six months before the accident, we must assume that Clymer would have discovered that the mine was unsafe and dangerous, and that he would have "immediately" notified the chief mine inspector that it was unsafe; and that the chief mine inspector, Welch, would have done his duty and "made a thorough personal examination of the mine at the earliest practicable time." And assuming that the chief mine inspector also found the mine unsafe and dangerous, we must also assume that he would have done his duty and posted the notice at the entrance to the mine warning the workers of the danger and to keep out, and have notified the operators and persons in charge of the mine of such dangerous condition, and to put it in repair; and that if necessary he would have applied to a court of chancery for an injunction restraining all persons from working in said mine except those employed in making improvements or repairs therein. Code, secs. 5551-5555.

There is evidence that tends to show that Clymer had not inspected this mine for as long a time as eighteen months prior to this explosion, whereas, it was his duty to inspect it "at least once every sixty days, or oftener"; and while the defendants say that this was evidence of a negative character, being the testimony of workers in the mine who merely testified that they had not seen him there in that time, still it was some evidence tending to prove the fact, which warranted the submission of the case to the jury.

■ The explosion itself is evidence that the mine was in a dangerous and unsafe condition at the time it occurred, and in the light of the proof we do not think it unfair to assume that had Clymer inspected it at least once every sixty days during the eighteen months prior to the explosion he would have observed its dangerous condition in time to have rectified it.

■ We think there is evidence of a direct causal connection between Clymer's failure to inspect the mine and the injuries suffered by the plaintiffs. Taking the plaintiffs' evidence as true we must assume that the mine was in a dangerous and unsafe condition for a long period of time before the explosion, and that Clymer must have observed such dangerous and unsafe condition if he had made the required inspections; and that if he had performed the duties required of him by the Act the necessary steps would have been taken for the protection of the plaintiffs and others working in the mine. To hold otherwise would be to put it in the power of the district mining inspector, by the mere non-performance of his duty to defeat entirely the purposes of this salutary Act which was passed "for the purpose of greater protection to the life and health of persons, employed in and around the mines." Section 5539.

■ The further argument is made that the plaintiffs themselves were aware of the conditions in the mine and that they assumed the risks incident to working under such conditions. This argument is completely answered in the opinion by Mr. Chief Justice Neil in the case of American Zinc Co. v. Graham, 132 Tenn. 586, 589, 590, 179 S. W. 138, 139, where it is said:

"The second inquiry is whether the miner assumed the risk of the situation, knowing, as he did, that the plaintiff in error had failed to comply with the statute. To hold

that he did assume the risk would be equivalent to a repeal of the statute, since it would be a continuing invitation to the company to forbear compliance with its provisions. The statute was passed under the police power of the state for the purpose of protecting those who are unable to protect themselves, occupying as they necessarily do a position much inferior in financial security to that of their employers; the physical necessity of themselves and their families making it essential that they should have work in order to secure the means of sustenance. It would defeat this beneficent purpose if it should be admitted as a sound principle that a failure of the employer to obey the statute could be condoned by the employee. Such a conclusion would place the employer in the position of power which only the Legislature should occupy, since it would enable him to either destroy or maintain the policies of the state according to his own will and purpose. Moreover, it would be inconsistent to admit a mutual regulation by employer and employee of a matter which had been deemed of sufficient importance to require an act of the Legislature to express a specific state policy. Such acts being passed to define rights and duties for the better regulation of business, and hence indirectly for the better regulation of society, must be sustained. They are not amenable to the doctrine of assumption of risk for the reasons we have stated, since a contrary decision would result in the court's loosing that which the Legislature has bound. Nor is the result changed by the fact that the statute fixes a penalty for its violation. The doctrine that the assumption of the risk does not apply is in harmony with the purpose of the penalty, and there is nothing in the act to indicate that the penalty was exclusive of the employee's right to maintain an action for damages. The views herein

expressed are sustained by the great weight of authority in this country."

For the reasons stated we are of opinion that the trial judge erred in granting the peremptory instruction as to Clymer and his surety.

 This is determinative of the case on this appeal, but we deem it proper to discuss the fifth assignment of error which complains of the action of the trial judge in excluding certain testimony of the witness Jeff Gothard as to the condition of said mine in November, 1939, which was five or six months before the explosion in which the plaintiffs were injured. The proof introduced tended to show that the explosion was caused by dust, poor ventilation and lack of circulation of air, and other defects, and that no inspection of the mine had been made in many months. The testimony excluded was to the effect that the mine was in bad condition in November, 1939, that there were no brattices as required, and no fans, etc. This testimony tended to support the plaintiff's theory of the case, and we think was not too remote in point of time. Inasmuch as the case will have to be remanded for a new trial we sustain this assignment of error so that this testimony may be admitted in evidence if offered at the next trial. It is not necessary for us to discuss the remaining assignments.

Our conclusion is that the peremptory instruction was properly granted as to Welch and his surety, and the judgment as to them is affirmed; but that the court erred in granting the peremptory instruction as to Clymer and his surety and the judgment as to them is reversed and the cause remanded for a new trial as to them. Clymer and his surety will be taxed with the costs.

Anderson, P. J., dissents as to Clymer and his surety.

Baptist, J., concurs.

Anderson, Presiding Judge (dissenting).

I dissent from the reversal of the judgment dismissing the suit against the defendant Clymer and his surety. I think the action of the court in directing a verdict as to all the defendants was correct.

It is apparent that the alleged breach of duty by the district inspector to inspect the mine "at least once every sixty days or oftener," is the essential foundation for the conclusion reached as to Clymer and his surety. It is conceded that the mine was one belonging to Class "B" defined by Code Section 5569. This section defines Class "B" mines, and provides, among other things, that the "*chief inspector* or a *district inspector* shall inspect and examine each mine of this class at least once every sixty days, or oftener, and determine if the mine is operated under the restriction governing mines of this class." (Emphasis mine.)

All the evidence relative to an inspection vel non relates to a failure by the district inspector, the defendant Clymer, to make the required inspection, and the only contention in the brief is that it appeared from the undisputed evidence that "the defendant Clymer made no inspection in the mine where the explosion occurred for a period of many months." Assuming that, notwithstanding its negative character, other questions aside, the evidence was sufficient to make a jury question on that point, still there was no evidence to show that the mine had not been inspected by the chief inspector. So, if presumptions are to be resorted to, then it would seem proper to presume that if the district inspector had not made the required inspection, the chief inspector had done so; for I think that evidence that the district inspector did not inspect the mine within the required period did not warrant the conclusion that the chief inspector had not done

so. An inspection by the latter would have served the same purpose as an inspection by the former and if made, I think that Clymer and his surety could not be liable in this case.

But apart from this, there are other reasons which I think support the judgment dismissing the suit as to Clymer and his surety.

Conceding that a public officer may be liable for non-feasance in a proper case, yet before this can be true, the duty alleged to be breached must be one in the performance of which the officer has no discretion. Binkley v. Hughes, 168 Tenn. 86, 73 S. W. (2d) 1111, and cases cited; Fryar v. Hamilton County, 160 Tenn. 216, 22 S. W. (2d) 353; Campbell County v. Ridenour, 22 Tenn. App. 250, 120 S. W. (2d) 1000. There is nothing in the recent case of Tyler v. Obion County, 171 Tenn. 550, 106 S. W. (2d) 548, that modifies this rule.

This action is essentially based upon a breach of the duty or duties imposed by pertinent Code sections and arising out of a discovery of a dangeorus condition of a mine.

To have warranted a recovery it would have been necessary to find that these duties were absolute; that they were not performed; and that had they been performed the injuries would not have been sustained. In determining whether the first essential element was present, regard must be had to all the acts required by the statute which it is claimed would have operated to prevent the injuries had they been performed. It is not sufficient in my opinion to have regard to only the first of these acts, namely, the duty to inspect. If, upon inspecting the mine and finding it in a dangerous condition, the subsequent steps required by the statute and which it is claimed would have prevented the injuries, lay within the discretion of

the officer, to take or not take "according to his own judgment" (Binkley v. Hughes, supra, 168 Tenn. at page 90, 73 S. W. (2d) at page 1112), then the action will not lie. See, 43 Am. Jur. 90, 91.

It seems to me that whether a dangerous condition existed within the meaning of the statute was necessarily committed to the judgment of the inspector; for, considering the inherent nature of the operations and the detailed precautions for safety required by the statute, the matter is one about which there might be an honest difference of opinion.

Upon the discovery of a dangerous condition, the Code requires two lines of action on the part of a district inspector. One is that he shall notify the operator with a direction to rectify the condition "within a certain reasonable time" and also notify any person endangered thereby. Code sections 5551, 5554. To have inferred that if Clymer had done this the injuries would have been prevented would, it seems to me, have been necessary to indulge in the presumption that either the operator of the mine would have remedied the condition in time to have prevented the injuries, bearing in mind that he had a reasonable time to do so after notice, or that the plaintiffs, having been served with the notice, would not have entered the mine and subjected themselves to the danger.

But so far as statutory requirements are concerned, neither the duty of the operator to correct the condition nor the duty of the miners to obey the warning notice would have arisen until the required notice was given. To have concluded that an inspection of the mine would have prevented the injuries it would have been necessary to first presume that Clymer would have done his duty in giving the required notice thus giving rise to a duty on the part of the operator and the employees and then in-

dulge in the further presumption either that the operator not only would have performed his duty but would have done so in time to have prevented the injuries or in the presumption that the plaintiffs would have done their duty and stayed out of the mine. It seems to me that to have indulged in either of the last mentioned presumptions would have been to base a presumption upon a presumption in violation of the pertinent rule (Shockley v. Produce Co., 158 Tenn. 148, 161, 11 S. W. (2d) 900), for, as I say, the conclusion that a duty rested on the part of the operator and the plaintiffs, necessarily would have rested solely on the presumption that Clymer would have given the required notices if he had inspected the mine.

Presumptions are indulged in for the purpose of supplying evidence and if they are inherently speculative they can no more be said to warrant a verdict than can evidence which embodies the same vice. Cf.: Railroad Co. v. Lindamood, 111 Tenn. 457, 78 S. W. 99; Ward v. Ry. Co., 15 Tenn. App. 380.

Again, it seems to me that it would have been to speculate against the facts to have presumed that the notice required by the statutes to be given by the district inspector would have had the desired result. Both the operator and the plaintiffs knew about the dangerous condition of the mine and a notice from the inspector would have added nothing to their knowledge in this respect. To presume that the notice would have been more effective than the actual knowledge which the parties had, it seems to me, would have been to prefer conjecture to facts.

The other line of action required by a district inspector upon discovering a dangerous condition in a mine relates to a report to the chief inspector and consequent action

by that official designed to remedy the condition. The Code specifically requires what he shall do upon receipt of such a report. It would serve no purpose to detail these requirements. Any conclusion based upon the theory that if the chief inspector had done any of the things required by the statute would have necessarily postulated the existence of the duty to do such of them as would have prevented the injuries sustained. But such a duty could not arise until the district inspector did his duty in making the report. The majority necessarily holds this in holding that the verdict was properly directed as to the chief inspector and his surety. So in order to reach a verdict against the district inspector upon the theory I am now discussing, it would have been necessary to conclude that a duty on the part of the chief inspector existed and to presume not only that he would have performed his duty but that he would have done so in time to have prevented the injuries. Assuming for the moment that the injuries would have been prevented if the chief inspector had performed his duty, it is necessary to infer the existence of this duty from the presumption that Clymer made the inspection and did his duty in making the required report. This, it seems to me, would have been drawing an inference from a presumption in an impermissible manner. In short, the presumption that if the chief inspector had done his duty the injuries would thereby have been prevented seems to be necessarily to be based upon a prior presumption that if Clymer had inspected the mine he would have done his duty in making the report.

But even if it were permissible to infer the existence I think to have said that the performance of his duty of an active duty on the part of the chief inspector, still

would have prevented the injuries would have been to resort to conjecture and speculation.

The case of United States v. Ross, 92 U. S. 281, 23 L. Ed. 707, is a leading one on the question of conjecture and has received the approval of our Supreme Court in Railroad Co. v. Lindamood, 111 Tenn. 457, 78 S. W. 99. I think the rule there laid down applicable here. Speculation with respect to the proximate cause of an injury is no more permissible than it is with respect to the amount of the damages. 15 Am. Jur. 410, 413; see, Meador v. R. R., 177 Tenn. 273, 148 S. W. (2d) 371; Ward v. R. R., 15 Tenn. App. 380. As has been often said, "The law requires an open, visible connection between the principal and evidentiary facts and the deductions from them and does not permit a decision to be made on remote inferences." Railroad Co. v. Lindamood, supra, and cases cited.

Moreover, in my opinion the element of discretion is present in at least some of the essential links in the chain of duties imposed upon the chief inspector which it is necessarily insisted would have prevented the injuries had they been performed.

For reasons that are obvious from what I have said, I think the verdict was properly directed as to the chief inspector Welch but I respectfully dissent from the reasoning of the majority opinion approving that result. As I understand it, it is based essentially upon a lack of knowledge upon the part of Welch of the dangerous condition of the mine. This could not have been the case if Clymer had inspected the mine and made a correct report. In the majority opinion it is first held that the undisputed evidence was sufficient to warrant the conclusion that Clymer made no inspection. Notwithstanding this conclusion it is also held that it is to be presumed

that Clymer made the report required by the Code sections following an inspection. If this is a permissible presumption, then it would seem necessarily to follow that in order to hold that the chief inspector had no notice of the dangerous condition of the mine, it would have to be presumed that Clymer made a false report which seems to me to be squarely in the face of the presumption that every official does his duty in the absence of evidence to the contrary. I think it more logical to presume that if in fact Clymer made no inspection, he made no report.

The apparent conflict very well illustrates I think the tricky nature of presumptions and the hazard involved in resorting to them to supply the absence of proof.

I think that the judgment should be affirmed as to all defendants.