Barbara G. MYERS, Individually and as Administratrix of the Estate of Charles R. Myers (92–5812); Joyce Ann Layne Rollins, Individually and as Administratrix of the Estate of Darrell Glenn Rollins (92–5813); Connie Rancene Kilgore

Parson Dykes, Individually and as Administratrix of the Estate of Gaylon L. Parson (92–5814); Georgia Ruth Nolan Henry, Individually and as Administratrix of the Estate of Harvey J. Nolan, Jr. (92–5816), Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

Nos. 92–5812, 92–5813, 92–5814, 92–5816.

United States Court of Appeals, Sixth Circuit.

Argued June 8, 1993.

Decided March 1, 1994.

Joseph A. Woodruff (argued and briefed), James H. Walker, William E. Shofner, Waller, Lansden, Dortch & Davis, Nashville, TN, for Barbara G. Myers, Joyce Ann Layne Rollins, Connie Rancene Kilgore Parson Dykes and Georgia Ruth Nolan Henry.

Gary Humble, David G. Dake, Asst. U.S. Attys., Chattanooga, TN, Phyllis J. Pyles, Robin D. Smith (argued and briefed), U.S. Dept. of Justice, Torts Branch, Civil Div., Stuart M. Gerson, U.S. Dept. of Justice, Civil Div., Washington, DC, for U.S.

Before: GUY and SUHRHEINRICH, Circuit Judges; and DOWD, District Judge.[*]

SUHRHEINRICH, Circuit Judge.

The issue presented is whether, under the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (the "FTCA"), the United States may be held liable for the deaths of plaintiffs' decedents caused by a methane explosion in a Tennessee coal mine operated by Grundy Mining Company (Grundy). The district court dismissed plaintiffs' cases for lack of subject matter jurisdiction, finding plaintiffs had not alleged facts sufficient to bring their claims against the United States within the limited waiver of sovereign immunity embodied in the FTCA.[1] We **AFFIRM**.

## I.

The wives and duly appointed administratrices of six miners killed in a 1981 explosion in a Tennessee coal mine filed suit against the United States,[2] alleging that the negligence of certain inspectors from the Mine Safety and Health Administration (MSHA), a division of the Department of Labor,[3] caused the fatal explosion. Four of these plaintiffs filed timely notices of appeal and, by stipulation of the parties pursuant to Rule 3(b) of the Federal Rules of Appellate Procedure, their appeals have been consolidated in this court for purposes of argument and opinion.

### A.

On December 8, 1981, miners working in Grundy Mine Number 21, as part of a planned expansion, drilled through from the working face of the mine into an abandoned, mined-out area. The abandoned area, which had been sealed off and could not be inspected, contained a dangerous concentration of methane gas. The methane gas began seeping into the active area of the mine where it was immediately detected. Rather than plug the hole or evacuate the mine, Grundy's foremen and superintendents ordered a larger hole cut into the working face so that the methane, trapped in the abandoned area of the mine, could dissipate and be ventilated out through the active portions of the mine. Grundy's ventilation system, however, was

---

[*] The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

[1.] *Cooley v. United States*, 791 F.Supp. 1294 (E.D.Tenn.1992) (neither plaintiff Cooley nor plaintiff Campbell have sought review of their dismissal, leaving plaintiff Myers as the first-named appellant in this court).

[2.] Plaintiffs originally named the Department of Labor as defendant. The United States, as the proper party, was later substituted.

[3.] MSHA was created by the Federal Mine Safety and Health Act of 1977, Pub.L. No. 95–164, 91 Stat. 1290 (codified at 30 U.S.C. §§ 801–962) (the Act). The Act also updated prior federal mine safety legislation, incorporated more stringent and specific requirements and, for the first time, placed the regulation of all of the nation's mines under a single federal agency.

inadequate for this task and the concentration of methane gas at the working face of the mine soon reached dangerous levels. This methane gas and the airborne coal dust needed only a single spark—apparently supplied by a miner's forbidden use of a cigarette lighter—to explode killing plaintiffs' decedents and seven other miners in the area.

MSHA inspectors, in the wake of this disaster, inspected the Grundy mine and determined that a number of safety violations contributed to the explosion. The MSHA report concluded:

> The failure of the management and miners to abide by the smoking prohibition and the failure of management to provide ventilation controls necessary to maintain adequate ventilation in [the active portion of the mine] and to maintain an effective bleeder system [to ventilate the] abandoned area were direct causes of the explosion.

It was also determined that, not only had Grundy's ventilation *plan* been inadequate, but also that Grundy failed to *implement* the plan as approved by MSHA. Finally, Grundy failed to follow adequate coal dust suppression techniques, a practice for which Grundy had been cited prior to the explosion. The MSHA report concluded, however, that very little coal dust participated in the explosion which was, predominantly, a methane-air ignition. Other violations were found, but no connection between these violations and the explosion was established.

**B.**

In their identically worded complaints, plaintiffs allege the existence of seven "mandatory non-discretionary" duties on the part of MSHA officials arising out of federal mine safety statutes and MSHA regulations. MSHA's breach of these duties, the plaintiffs contend, gives rise to liability under either the state-law "negligence per se" or "good samaritan" doctrines. These duties, and the statutes or regulations from which they stem, are taken from plaintiff Myers' complaint as follows:

1. "to disapprove unsafe and inadequate ventilation plans proposed by mine operators," relying upon 30 C.F.R. §§ 75.316 et. seq.;

2. "to provide a minimum of one spot inspections [sic] every five working days at irregular intervals upon finding in a mine an especially hazardous condition," relying upon 30 U.S.C. § 813(i);

3. "to inspect each underground coal mine in its entirety at least four times a year in order to determine whether an imminent danger exists and whether there is compliance with the mandatory health and safety standards set forth in the Act and the rules and regulations promulgated thereunder," relying upon 30 U.S.C. § 813(a);

4. "to order mine operators to withdraw all persons in areas affected by significant and substantial violations of mandatory health and safety standards until such violations have been abated," relying upon 30 U.S.C. § 814(e);

5. "to withdraw all persons in areas affected by unwarrantable failure violations of mandatory health and safety standards until such violations have been abated," relying upon 30 U.S.C. § 814(d)(1);

6. "to withdraw all persons in areas where imminent danger exists until such danger is abated," relying upon 30 U.S.C. § 817(a);

7. "to issue citations [upon the inspector's belief that a violation exists], and upon violation of such citations, to prohibit unauthorized persons into areas covered or affected by such citations," relying upon 30 U.S.C. § 814(a)-(b).

The government moved to dismiss plaintiffs' complaints for lack of subject matter jurisdiction on the grounds that the acts of MSHA inspectors, had they been performed by "private individuals," would not have given rise to tort liability under applicable state law. Furthermore, the government argued, even if such liability could exist, Congress has preserved sovereign immunity in this instance because the actions of the MSHA inspectors are protected by 28 U.S.C. § 2680(a), the "discretionary function" exception to the FTCA.

The district court granted the government's motions to dismiss, relying exclusively upon the discretionary function exception. The district court held that MSHA inspectors were given considerable discretion under the relevant statutes and regulations and, because this discretion was to be exercised in furtherance of the same governmental policies which led to the enactment of the various statutes and regulations, the discretionary function exception to the FTCA barred plaintiffs' claims.

We disagree. For the reasons expressed below, we hold that the discretionary function exception does not apply to the actions of MSHA inspectors about which plaintiffs complain. Nevertheless, we affirm the district court's dismissal because state law provides no grounds upon which plaintiffs could recover had the MSHA inspectors been "private individuals" and, therefore, the general waiver of sovereign immunity under the FTCA does not apply.

## II.

The parties and the district court focused their attention on the applicability of the "discretionary function" exception to plaintiffs' claims. Although this places the proverbial cart before the horse, see infra at Section III., we also begin our analysis with this issue.

## A.

■ The FTCA does not create a cause of action against the United States. Howell v. United States, 932 F.2d 915, 917 (11th Cir. 1991). Nor does the FTCA provide a means of enforcing federal statutory duties. Sellfors v. United States, 697 F.2d 1362, 1365 (11th Cir.1983), cert. denied, 468 U.S. 1204, 104 S.Ct. 3571, 82 L.Ed.2d 870 (1984). Rather, it constitutes consent to suit and is fundamentally limited to cases in which "a private individual [would be liable] under like circumstances." 28 U.S.C. § 2674. Even where a government employee, acting in the scope of his employment, fails to exercise due care under circumstances that would leave a "private individual" liable under state law, Congress has retained the principle of sovereign immunity in certain situations. 28 U.S.C. § 2680(a)-(n). The government argues, and the district court agreed, that 28 U.S.C. § 2680(a), the discretionary function exception, applies in this case. This exception provides that the FTCA's waiver of sovereign immunity shall not extend to:

> Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

■ For some time, it was thought that the discretionary function exception extended blanket protection from suit to all regulatory activities of the various federal agencies. See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 813–14, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984) ("whatever else the discretionary function exception may include it plainly was intended to encompass the discretionary acts of Government acting in its role as a regulator of the conduct of private individuals"). In Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), however, the Court revisited the applicability of the discretionary function exception with an eye toward limiting the broad language of Varig Airlines.

> In restating and clarifying the scope of the discretionary function exception, we intend to specifically reject the Government's argument ... that the exception precludes liability for any and all acts arising out of the regulatory programs of federal agencies.... To the extent we have not already put the Government's argument to rest, we do so now. The discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment.

Id. at 538–39, 108 S.Ct. at 1959–60 (emphasis added).

Thus, although the policy behind the exception is "to prevent judicial 'second-guessing' of legislative and administrative decisions," Varig, 467 U.S. at 814, 104 S.Ct. at 2765, courts are not free simply to apply the exception wherever it appears to serve this

purpose. Instead, the Supreme Court, in *Berkovitz* and in *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), enunciated a comparatively rigid two-step analysis.

First, does the authority under which the action was taken allow the actor discretion to *choose* from among alternative courses of action? More simply, is the actor authorized to make decisions, or is a specific action required in all cases? *See Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958 ("discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow"); *Gaubert,* 499 U.S. at 324, 111 S.Ct. at 1274 (discretionary function exception provides "no shelter from liability [where] there is no choice").

Second, if choice is permitted, is the actor *authorized* to make those choices on the basis of "social, economic, or political policy?" More simply, is the actor authorized to set public policy or does he merely implement, under objective criteria, the policy decisions of others? *See Berkovitz,* 486 U.S. at 537, 108 S.Ct. at 1959 (discretionary function exception "protects only governmental actions and decisions based on considerations of public policy"); *Gaubert,* 499 U.S. at 323, 111 S.Ct. at 1274 (only choices "grounded in the social, economic or political goals of the statute and regulations are protected").

**B.**

▮ With this structure in mind, we turn our attention to plaintiffs' claims. Plaintiffs' characterization of the "duties" arising under MSHA as "mandatory non-discretionary" is conclusory and self-serving. Even the most cursory glance at the plaintiffs' wording of the these duties shows that they are replete with choice and, thus, discretion.

Each of the "duties" alleged by the plaintiffs involve an "if/then" logical structure. If the mine inspector determines that a particular condition exists, then the statutes and regulations require the inspector to take some specific action or to choose from among a limited range of actions. For instance, plaintiffs allege a "mandatory non-discretionary" duty on the part of MSHA inspectors to "disapprove unsafe and inadequate ventilation plans." This duty to "disapprove," however, only arises if the MSHA official determines that the plan is deficient. Similarly, all of the "duties" alleged by the plaintiffs involve an antecedent assessment before a particular course of action is required:

2. *if* "an especially hazardous condition" is found, *then* inspectors *must* conduct spot inspections once every five days;

3. *if,* during mandatory quarterly inspections, a safety violation is discovered, *then* inspectors *must* issue a citation and, if the violation poses an "imminent danger," a withdrawal order;[4]

4. *if* "significant and substantial violations" are found, *then* inspectors *must* issue a withdrawal order;

5. *if* two "unwarrantable failure violations" are found within 90 days, *then* inspectors *must* issue a withdrawal order;

6. *if* an "imminent danger" is found, *then* inspectors *must* issue a withdrawal order; and

7. *if* a "violation" is found which does not constitute an imminent danger but which continues, after citation, beyond the time set for abatement, *then* inspectors *must* issue a withdrawal order.

These "mandatory non-discretionary" duties, therefore, each require that a MSHA inspector first determine that some predicate condition exists. Until that assessment is made, the inspector is not bound by statute

---

**4.** The requirement of quarterly inspections is mandatory under 30 U.S.C. § 813(a). Plaintiffs, however, do not allege that MSHA inspectors failed to conduct these inspections. Instead, plaintiffs contend that, because violations were later found for which no citations had been issued, the MSHA inspectors breached the "implied" mandatory duty to discover every violation during every inspection.

We find no such duty in Section 813(a). Although the requirement to make the inspections is mandatory, the requirement to issue a citation only becomes mandatory once the inspector determines a violation exists. Viewed in this manner, plaintiffs' third allegation of duty, like the other six, contains an element of choice sufficient to satisfy the first prong of the *Berkovitz/Gaubert* analysis.

or regulation to do anything other than inspect. This requirement of an antecedent assessment or determination presents the MSHA official or inspector with a *choice;* does the condition exist or doesn't it? This choice is sufficient to satisfy the first prong of the *Berkovitz/Gaubert* analysis.[5]

### C.

■ Having determined that each of the duties alleged by the plaintiffs require decisions or choices by the MSHA inspectors before any mandatory statutory or regulatory duty arises, it remains only to be determined whether these choices or decisions are "grounded in the social, economic or political goals of the statute and regulations," *Gaubert,* 499 U.S. at 323, 111 S.Ct. at 1274, such that they are immune from suit under the discretionary function exception.

In *Gaubert,* the most recent Supreme Court decision directly construing the discretionary function exception, the Court held that choices made by regulatory agency actors are *presumptively* based on considerations of policy.

> When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.

*Gaubert,* 499 U.S. at 324–25, 111 S.Ct. at 1274–75. The Court characterized this presumption as "strong," but recognized that, in many cases, the presumption would be rebutted because many acts performed by agency personnel—though they involve a significant degree of choice—are not grounded in regulatory policy and thus are not protected by the discretionary function exception. *Id.* at 325–26 n. 7, 111 S.Ct. at 1275 n. 7.

The Court, however, rejected any "per se" rule which would limit the application of the discretionary function exception to choices made at the "planning," as opposed to "operational," level of agency action.[6] Rather, the court held that it is "the *nature* of the conduct, rather then the *status* of the actor, that governs whether the discretionary function exception applies in a given case." *Id.* (quoting *Varig,* 467 U.S. at 813, 104 S.Ct. at 2764) (emphasis added). In determining whether the conduct in a particular case sufficiently rebuts this presumption, the inquiry must focus on an objective evaluation of the discretion conferred rather than a review of the actor's subjective method of choosing a course of action. *Id.* 499 U.S. at 325–26, 111 S.Ct. at 1275.

The nature of the conduct upon which plaintiffs base their claims consists of the failure of MSHA inspectors to (a) reject Grundy's proposed ventilation plan (duty # 1), (b) institute a spot-check system, (duty # 2), and (c) issue citations and "withdrawal orders" for safety violations, (duties # 3–7). As we held in the previous section, none of these duties arises until the MSHA official or inspector makes an assessment that a particular condition exists. Therefore, our focus must be on the conduct of these safety inspections and the determinations of whether violations exist.

The government argues that these antecedent assessments are to be made in light of the public policy underlying the Act and the

---

5. It is important to stress that, under a discretionary function exception analysis, allegations of negligence are irrelevant. *Dalehite v. United States,* 346 U.S. 15, 33, 73 S.Ct. 956, 966, 97 L.Ed. 1427 (1953). Thus, it matters not whether the MSHA inspectors "should" have made a particular assessment; our inquiry is limited to whether the process of inspection and assessment involves choices, and whether those choices are authorized to be made on the basis of "social, political or economic policy."

6. Justice Scalia's concurring opinion, however, aptly points out that the status of the actor is not wholly irrelevant. Rather, the higher the actor stands in a particular agency, the stronger the presumption that he is afforded discretion to devise public policy. Conversely, the lower the status of the actor, the less likely it is that he is authorized to set policy and the more likely he is to be merely implementing the policy choices of others. *Gaubert,* 499 U.S. at 334–38, 111 S.Ct. at 1280–81 (Scalia, J., concurring in result).

MSHA regulations. Plaintiffs respond that MSHA inspectors should be guided by objective principles of safety, not concerns of public policy. Though the government's argument is not without persuasive force, we reject it because it fails to account for the Supreme Court's holding in *Berkovitz* and, we believe, would result in precisely the kind of sweeping application of the discretionary function exception that the Court rejected. Additionally, the government's argument relies too heavily on the presumption in *Gaubert* and fails to demonstrate that any consideration of "political, social or economic policy" by MSHA inspectors is, in fact, authorized by the regulatory scheme.

### 1.

The precise question presented in this case has been analyzed, but not resolved, by the Supreme Court in *Berkovitz*. There, the plaintiff sued the United States for injuries caused by a defective lot of polio vaccine. The Bureau of Biologics, charged with issuing product licenses for polio vaccines to qualifying manufacturers, allegedly issued the relevant product license "even though the vaccine did not comply with certain regulatory standards." *Berkovitz*, 486 U.S. at 543, 108 S.Ct. at 1962. The Court posited three factual bases for plaintiff's claim: (1) the Bureau had issued the license without making *any* finding regarding compliance, (2) the Bureau had determined that the vaccine was *not* in compliance but had issued the license *anyway*, and (3) the Bureau had determined that the vaccine was *in* compliance but that its determination was *wrong*. *Id.*

The Court held that, if plaintiff's claim were based on either of the first two theories, the discretionary function exception obviously would not apply because each involves the violation of a clear statutory duty. *Id.* at 544, 108 S.Ct. at 1962. The third theory, however, "requires a somewhat different analysis." *Id.* at 544–45, 108 S.Ct. at 1963. The Court held that the "application of the discretionary function exception to the claim that the determination of compliance was *incorrect* hinges on whether the agency officials making that determination *permissibly exercise policy choice.*" *Id.* at 545, 108 S.Ct. at 1963 (emphasis added). If so, the Court held that the discretionary function exception would apply and suit would be barred. If the determination is to be made by the mere "application of objective scientific standards," however, plaintiff's claim would not be barred. *Id.*

In the present case, plaintiffs allegations are properly characterized as falling within the third *Berkovitz* category. Plaintiffs do not contend, for instance, that MSHA inspectors actually found safety violations in the Grundy mine but then failed to take the required action.[7] Rather, plaintiffs contend that the MSHA inspectors *should have found*, but *failed to find*, the existence of certain safety violations and, if they had, the deaths of these miners would have been prevented. As the Court in *Berkovitz* held, the applicability of the discretionary function exception in such situations turns on whether the MSHA inspector is authorized to make such assessments as a matter of public policy, or whether those determinations are supposed to be the product of more objective criteria. We hold that neither the Act nor the MSHA regulations authorize mine safety inspectors to conduct their inspections on the basis of "social, economic or political policy."

Our decision is based upon the Supreme Court's holding in *Gaubert*. There, the agency conduct under review was the day-to-day oversight of a failing savings and loan by the Federal Home Loan Bank Board (the FHLBB). In each of the day-to-day decisions, the regulators had to balance the need "to protect the solvency of the savings and loan industry at large, and maintain the pub-

---

7. *See, e.g., Collins v. United States*, 783 F.2d 1225 (5th Cir.1986). There, the discretionary function exception was held inapplicable to claims arising from a methane explosion in a Louisiana salt mine. Plaintiffs claimed that MSHA inspectors failed to reclassify the mine as "gassy" and close it until additional safety equipment had been installed, despite the fact the MSHA inspectors had detected methane in excess of the regulatory maximum on numerous occasions. The court correctly noted that, once the initial assessment had been made, the MSHA officials had an absolute duty to reclassify the mine and their failure to do so was not a protected exercise of policy discretion. *Id.* at 1230–31.

lic's confidence in that industry," with the need to "preserve the assets of [the thrift] for the benefit of depositors and shareholders...." *Gaubert*, 499 U.S. at 332, 111 S.Ct. at 1278. Moreover, this balancing had to be done with an eye toward "protect[ing] the FSLIC's insurance fund." *Id.* Thus, the judgments made were not ordinary business judgments to be made simply on the basis of the best interests of the savings and loan. Rather, the decisions were authorized to be made, and were in fact made, based upon considerations of what was good for the public fisc and the industry as a whole, as well as what was good for the particular institution. *Id.* This *balancing* of interests, the Court held, characterizes the type of discretion that the discretionary function exception was intended to protect. *Id.* Based on *Gaubert*, therefore, we believe that some authorization to conduct this type of balancing is a necessary prerequisite for finding that the actions complained of are protected by the discretionary function exception.[8]

In the present case, the balancing of the interests of the miners and the mine owners, and the consideration of the most effective use of limited MSHA resources has been done, first by Congress and then, to a greater degree, by the Secretary of the Department of Labor in promulgating the various safety regulations. The MSHA inspectors whose conduct is at issue in the present case

are *not authorized* to reweigh these interests on a case-by-case basis. Rather, they are to determine compliance and, in the event of non-compliance, issue the mandatory citations and orders.

### 2.

Accordingly, based upon *Berkovitz* and *Gaubert*, we hold that the assessments made by MSHA inspectors are not "policy" decisions protected by the discretionary function exception to the FTCA. Instead, the choices inherent in these assessments are to be made by MSHA inspectors in light of their own observations, informed by professional judgment and knowledge of the industry. Considerations of "political, social or economic policy" are not *authorized* to play a part in these assessments. Therefore, we hold that the discretion afforded MSHA inspectors by the Act and the relevant regulations is not grounded in public policy and is not protected by the discretionary function exception.[9]

### III.

At the beginning of the preceding section, we noted that focusing solely on the applicability of the discretionary function exception, as the district court did, was "putting the cart before the horse." Unless the plaintiffs have pled facts sufficient to justify

---

8. Though the case involved the liability of a private party, the Supreme Court relied heavily on its prior analyses of the discretionary function exception in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The Court stated that, unlike ordinary design decisions,

> the selection of the appropriate design for military equipment to be used by the Armed Forces is assuredly a discretionary function. It often involves *not merely engineering analysis* but judgment as to the *balancing* of many technical, military, and even social considerations, including specifically the *trade-off* between greater safety and greater combat effectiveness.

*Id.* at 511, 108 S.Ct. at 2518 (emphasis added). It is precisely this type of "trade-off" or balancing that is missing in the present case.

9. Our decision is consistent with the result reached in a recent court of appeals decision involving the applicability of the discretionary function exception to the actions of MSHA in-

spectors. *See Ayala v. United States*, 980 F.2d 1342, 1349–50 (10th Cir.1992) (discretionary function exception inapplicable to protect MSHA inspectors' technical recommendations which were based upon "objective principles of electrical engineering," rather than considerations of public policy). *Accord Caplan v. United States*, 877 F.2d 1314 (6th Cir.1989) (decision to deforest part of government's land was grounded in policy; decision not to warn contractor of the danger involved only ordinary principles of safety and, therefore, plaintiff's claims were not barred).

We recognize, however, that our decision is in conflict with older decisions applying the discretionary function exception to the actions of MSHA inspectors. *See Hylin v. United States*, 755 F.2d 551 (7th Cir.1985); *Russell v. United States*, 763 F.2d 786 (10th Cir.1985); *Bernitsky v. United States*, 620 F.2d 948 (3d Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980). We note that these decisions predate *Berkovitz* and *Gaubert*, upon which our decision is based.

liability under ordinary state-law principles, and thus invoked the court's subject matter jurisdiction under the general waiver of sovereign immunity in 28 U.S.C. § 2674, there is no *need* to resort to the exceptions in 28 U.S.C. § 2680, to dismiss the suit. It bears repeating that the FTCA does not *create* liability, it merely waives sovereign immunity to the extent that state-law would impose liability on a "private individual in similar circumstances." 28 U.S.C. § 2674. For the reasons expressed below, we hold that, where a governmental actor merely fails to ensure a private party's compliance with federal safety regulations, no comparable state-law liability exists and, therefore, sovereign immunity is not waived under the FTCA.

### A.

Plaintiffs first invoke the doctrine of negligence per se as a source of liability under state law. The Act and MSHA regulations, plaintiffs contend, are "safety statutes" enacted to protect a particular class (miners) from a particular kind of harm (unsafe mining conditions). Breach of these standards by MSHA inspectors, plaintiffs conclude, is negligence per se and provides the state-law basis for liability under the FTCA. Plaintiffs' argument, though often made by FTCA plaintiffs, is fundamentally flawed. First, the doctrine of negligence per se is never, by itself, a basis for liability. Second, the statutes and regulations governing the conduct of MSHA inspectors were not enacted primarily to protect miners. Finally, plaintiffs argument must fail because it would, in effect, create a private right of action under the Act in the guise of an action under the FTCA; an effect which Congress did not intend and could not have anticipated.

### 1.

■ The doctrine of negligence per se was created, not as a means of deciding when a

duty of care arises, but rather as a means of defining the particular standard of conduct such a duty requires. Restatement (Second) of Torts §§ 285–288 (1965) (hereinafter "Restatement"). Thus, a plaintiff, whether under state law or the FTCA, must first establish the existence of a relationship giving rise to a duty before attempting to rely on the doctrine of negligence per se to establish the standard of conduct required.[10]

In the present case, the relationship between the mine owners and the miners, as employer-employee, is sufficient to create a duty of care at common law.[11] In a negligence per se jurisdiction, the Act and MSHA regulations would define, in part, the standard of conduct required by that duty. Proof of a violation of these safety requirements would thus be presumed negligence, but it is the relationship of employer-employee that gives rise to the duty, not the safety regulations. *See Johnson v. Sawyer*, 4 F.3d 369, 376 (5th Cir.1993) (mere violation of federal statute by government employee does not give rise to FTCA suit on negligence per se grounds; the "subtle but crucial distinction between a duty and a standard of care" requires plaintiff establish an underlying duty before resort to negligence per se may be had); *Art Metal–U.S.A., Inc. v. United States*, 753 F.2d 1151, 1159 n. 15 (D.C.Cir. 1985) (characterizing plaintiff's attempt to invoke doctrine of negligence per se without establishing an underlying state-law duty as a "mistake" and a "flawed analysis").

■ We hold that the existence of some relationship between the governmental employee and the plaintiff to which state law would attach a duty of care in purely private circumstances is required under 28 U.S.C. § 2674. Plaintiffs' claim that liability exists under the doctrine of negligence per se ignores this element and, for that reason, is insufficient.

---

**10.** For instance, the common law recognizes that drivers of automobiles owe a duty of care to other drivers and to pedestrians. Speed limits, imposed by state law or city ordinance, merely define a part of the *standard* of conduct required to fulfill that duty. Therefore, a jurisdiction recognizing negligence per se would find proof of negligence in proof that a defendant was ex-

ceeding the speed limit at the time of the accident. It is the relationship of driver-to-driver, or driver-to-pedestrian, however, that gives rise to the duty, not the speed limit.

**11.** For purposes of this illustration, we ignore the impact of workers compensation legislation.

### 2.

■ Where the law imposes a duty, the doctrine of negligence per se provides that the violation of a statute, regulation or ordinance will give rise to a conclusive presumption of negligence if: (1) the statute was intended to protect a specific class of persons from a specific type of harm; (2) the plaintiff is a member of the protected class; (3) the plaintiff's injuries are the type from which protection was sought; and (4) the defendant's violation of the statute was the proximate cause of the plaintiff's injuries. *See Moody v. United States,* 774 F.2d 150, 157–58 (6th Cir.1985) (applying Tennessee law), *cert. denied,* 479 U.S. 814, 107 S.Ct. 65, 93 L.Ed.2d 24 (1986). *Accord* Restatement § 286.

The Act and MSHA regulations may be divided into two distinct categories: first, those that regulate the conduct of miners and mine owners; second, those that direct the actions of MSHA inspectors. The first category obviously consists of "safety" regulations because these regulations detail the standard of conduct owed by mine owners to miners and by miners to each other. A violation of these regulations would be conclusively presumed to be negligence. *Cf. Teal v. E.I. DuPont De Nemours & Co.,* 728 F.2d 799 (6th Cir.1984) (employer's breach of OSHA regulations was negligence per se under Tennessee law).

The second category of regulations, however, does not establish safety standards for the nation's mines; it merely establishes a means by which the government can monitor compliance with the first category of regulations. Even if the second category can be said to impose "duties" on MSHA inspectors, those duties run only to the Secretary of Labor, not to the miners. *See Clemente v. United States,* 567 F.2d 1140, 1144–45 (1st Cir.) (FAA regulations governing inspections and other monitoring functions impose duty, if at all, only to FAA superiors, not public), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

For instance, requiring mine owners to provide some specific level of ventilation is a "safety" regulation enacted to protect miners from inadequate ventilation. Conversely, requiring MSHA officials to *approve* ventilation plans and requiring MSHA inspectors to *monitor* ventilation in the mines are decisions made by Congress and the Secretary in order to ensure compliance. Certainly it may be said that this latter category of regulations indirectly benefit the miners; just as certainly, however, the second category of regulations are primarily intended to ensure *compliance,* not safety.

Plaintiffs cite *State v. Clymer,* 27 Tenn. App. 518, 182 S.W.2d 425 (1943), in support of their contention that the mere failure to comply with safety inspection regulations gives rise to liability under negligence per se. In *Clymer,* a Tennessee state mine inspector was found liable for failing to conduct the inspections required of him by state law. The liability imposed, however, was not personal liability. Instead, plaintiffs sued to recover on defendant's fifteen thousand dollar bond which state law required all such inspectors to post. *Id.* 182 S.W.2d at 430. Similarly, the "duty" upon which liability was based was expressly provided by state statute requiring inspectors to "faithfully discharge their duties" or forfeit their bond to the injured parties. *Id.* at 429–30. Far from establishing that Tennessee recognizes private liability for any violation of a statute, as plaintiffs contend, *Clymer* merely recognizes governmental liability when a governmental actor fails in his governmental duties.

■ The extent to which a state provides governmental liability is irrelevant, however, in an action under the FTCA, which only provides for liability "in the same manner and to the same extent as a *private individual* under like circumstances...." 28 U.S.C. § 2674 (emphasis added). We therefore reject *Clymer* as a basis for "per se" liability under state law. *Cf. Raymer v. United States,* 660 F.2d 1136, 1140 (6th Cir.1981) ("The pertinent inquiry is whether state law makes a private individual, not the state or other political entity, liable for an employee's failure to exercise due care under like circumstances.").[12]

**12.** Of somewhat greater relevance is the recent case, *Snider v. Snider,* 855 S.W.2d 588 (Tenn.Ct.

We hold, therefore, that the state-law requirements for negligence per se are not met when the regulations relied upon are concerned solely with the manner in which compliance with safety regulations will be monitored rather than the regulations that actually impose the safety standards.

### 3.

Finally, the plaintiffs' claim must fail because, were we to permit them to proceed on the basis of negligence per se, we would, in effect, be permitting a private cause of action under the Act. This we refuse to do.

In *Raymer v. United States*, 660 F.2d 1136, 1139 (6th Cir.1981), *cert. denied*, 456 U.S. 944, 102 S.Ct. 2009, 72 L.Ed.2d 466 (1982), this court held that the Federal Coal Mine Health and Safety Act of 1969 (the "1969 Act"), a predecessor to the Act, "did not create a private right of action by mine employees against the government." We find nothing in the Act to justify a departure from our decision in *Raymer*, and we reaffirm that holding now.

Plaintiffs' attempt to apply the negligence per se doctrine to these facts, if successful, would provide a means of making the government liable as an insurer for every private party's violation of a federal regulatory scheme. Where Congress has refused to create an express cause of action for the government's breach of a regulatory scheme, we decline to infer a cause of action under the FTCA through a misapplication of negligence per se principles.[13]

### B.

■ Plaintiffs contend that MSHA's undertaking to conduct inspections of the Grundy mine and to monitor Grundy's compliance with federal safety regulations creates the relationship between the MSHA inspectors and the miners necessary to support state-law liability. In support, plaintiffs cite Sections 323 and 324A of the Restatement (Second) of Torts. Because we hold that the mere failure to detect another's violation of safety regulations, without more, does not give rise to a duty under the good samaritan doctrine, plaintiffs' claims must fail on this ground as well.

### 1.

■ It is a fundamental rule of American tort law that "the fact that [an] actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." Restatement § 314. The common law recognizes, however, that an actor, by his affirmative acts, can create or assume a duty where none otherwise would have existed. *See* Restatement §§ 321–324A. It is upon this exception to the general rule that the plaintiffs rely.

Plaintiffs contend that, by undertaking to monitor private parties' compliance with governmental safety regulations, the government has assumed a duty of care towards the beneficiaries of those safety regulations such that it is liable for the negligence of its employees in the conduct of this monitoring. Plaintiffs rely on the good samaritan doctrine as expressed in Section 324A of the Restatement, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his

App.1993), in which the plaintiff tried to establish "per se" liability by proving that school officials had violated established school board policy. The state appellate court rejected plaintiff's negligence per se argument, however, holding that one cannot be presumed negligent at law simply for violating one's *own* rules. *Id.* at 590–91. In support of its holding, the court noted that the opposite rule would merely encourage defendants to adopt less stringent internal standards, or not to adopt internal rules at all. *Id.* The situation in *Snider* is analogous to the present case in which plaintiffs would hold the United States liable solely on the basis an alleged

violation of its own rules. The policy considerations noted in *Snider* are equally implicated here and, we believe, the same result should obtain.

13. *Berkovitz* is not to the contrary. There, the Court merely held that the discretionary function exception did not bar suit where the governmental employee failed to comply with a mandatory regulation. It expressly avoided the question of whether such a failure was sufficient to impose liability under state law. *Berkovitz*, 486 U.S. at 535 n. 2, 108 S.Ct. at 1958 n. 2.

things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking, if

(a) his failure to exercise reasonable care *increases the risk* of such harm, or

(b) he has undertaken to perform a *duty owed by the other* to the third person, or

(c) the harm is suffered because of *reliance* of the other or the third person *upon the undertaking*.

Restatement (Second) of Torts § 324A (1965) (emphasis added).

### 2.

Tennessee has never expressly adopted this restatement provision. *See Moody*, 774 F.2d at 155. For purposes of this analysis, however, we assume that the good samaritan doctrine is the applicable state law and, further, that it has been adopted in its most liberal formulation, that appearing in the Restatement.

The threshold inquiry under Section 324A in this case is whether the government has undertaken to render services to Grundy. While there is some authority for holding that MSHA inspections are not "undertakings to render services to another" within the meaning of Section 324A,[14] this circuit has held that MSHA inspections are sufficient undertakings to justify application of the good samaritan doctrine's other elements. *Raymer*, 660 F.2d at 1144.

The second pre-requisite to liability under Section 324A is that the MSHA inspectors must have been negligent in the conduct of their inspections. Negligence alone, however, is not sufficient under Section 324A because a plaintiff must also demonstrate that one of the three alternative bases for the imposition of a duty also existed. Because we hold that plaintiffs have not brought themselves within any of these alternatives, we assume for purposes of this analysis that the MSHA officials were, in fact, negligent in failing to discover and otherwise protect the miners from the dangers in the Grundy mine.

### 3.

The first circumstance under which the government might owe a duty to the miners under Section 324A is if, through a MSHA official's or inspector's negligence, the risk of harm to these miners was increased. Restatement § 324A(a). Thus, although MSHA has no duty to provide safe working conditions for the Grundy miners, if, by undertaking to monitor Grundy's compliance with federal safety regulations, and by subsequent negligence in the course of that monitoring, the MSHA inspectors make the mine less safe than it otherwise would have been, the government could be held liable for the injuries that occurred.

Plaintiffs, in attempting to bring themselves within this subsection, merely assert that the negligence of the MSHA inspectors "increased the risk of harm to plaintiff's husband in working in the Mine." Plaintiffs do not explain how, or to what degree, the risk of explosion was increased, nor have their briefs or arguments enlightened us. Apparently, plaintiffs contend that by failing to detect safety violations in the mine, the dangerous conditions were allowed to continue over time. Even though the risk was constant, plaintiffs seem to argue, the probability of harm increased with the passage of time. We reject this argument.

In *Raymer*, this court summarily rejected a similar argument. "[I]t is clear that the extensions [of time in which to abate safety violations] granted by the mine inspectors in the present case did not increase the danger of harm...." *Raymer*, 660 F.2d at 1143. Other circuits agree. *See Howell*, 932 F.2d at 918–19 ("for purposes of the section 324A 'good samaritan' doctrine, a risk is only increased when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed") (quotations and citations omitted); *Patentas v. United States*, 687 F.2d 707, 716–17 (3d Cir.1982) ("the comment

---

**14.** *See McCreary v. United States*, 488 F.Supp. 538, 540 (W.D.Pa.1980) (MSHA inspections under the 1969 Act are not undertakings within the meaning of Section 324A); *Mercer v. United States*, 460 F.Supp. 329, 332 (S.D.Ohio 1978) (same; applying Metal and Nonmetallic Mine Safety Act, another predecessor of the Act).

[c] to section 324A makes clear that 'increased risk' means some physical change to the environment or some other material alteration of the circumstances.").

These cases illustrate plaintiffs' fundamental misconception regarding Section 324A(a). The test is not whether the risk was increased over what it would have been if the defendant had not been negligent. Rather, a duty is imposed only if the risk is increased over what it would have been had the defendant not engaged in the undertaking at all. This must be so because the preliminary verbiage in Section 324A assumes negligence on the part of the defendant and further assumes that this negligence caused the plaintiff's injury. If we were to read subsection (a) as plaintiffs suggest, *i.e.,* that a duty exists where the negligence increased the risk over what it would have been had the defendant exercised due care, a duty would exist in every case. Such a reading would render subsections (b) and (c) surplusage and the apparent purpose of all three subsections to limit application of the section would be illusory.

Therefore, we hold that plaintiffs must allege facts showing that the governmental actor affirmatively either made, or caused to be made, a change in the conditions which change created or increased the risk of harm that befell the miners. Their complaints are insufficient in this regard and, because our review of the record before the district court indicates that no such alteration occurred, we hold that plaintiffs may not proceed under Section 324A(a).[15]

As to Section 324A(b), plaintiffs have not argued, and wisely so, that the government could be held liable for undertaking to fulfill the duty owed by Grundy to the miners. Congress intended that the primary duty of ensuring safety would be on the mine owners and the miners. 30 U.S.C. § 801(e). The inspections performed by MSHA are for the purpose of ensuring that Grundy and the miners comply with their duties, not for the purpose of relieving them of those duties. *See* 30 U.S.C. § 801(g). For us to hold that these MSHA inspections have supplanted Grundy's responsibility and rendered the United States liable for the condition of Grundy's mine would requires us to ignore the plain language of the Act. Therefore, we hold that 324A(b) is not available to plaintiffs in this case.

Finally, to state a cause of action under the good samaritan doctrine, and thereby successfully invoke the waiver of sovereign immunity under the FTCA, plaintiffs must plead facts sufficient to bring their cases within the "reliance" alternative set forth in Section 324A(c). Plaintiffs contend that the death of these miners resulted from the miners' (or Grundy's) reliance upon MSHA inspectors to monitor Grundy's compliance with the regulations. Specifically, plaintiffs allege that the absence of citations or other enforcement methods by the MSHA inspectors was taken by the miners to mean that there were no violations and that the mine was safe. These allegations are insufficient to show justifiable, detrimental reliance and, therefore, plaintiffs' complaints must fail.

Plaintiffs' claim fails because they have not alleged, nor could they allege, that the miners' relied upon the MSHA inspections to their detriment. The comments to the Restatement with respect to the element of reliance make clear that the reliance must have induced either the miners or Grundy "to forgo other remedies or precautions against the risk." Restatement § 324A cmt. e. (1965). In other words, the reliance must have been detrimental. *See Howell,* 932 F.2d at 919 n. 5 (plaintiff must show "physical manifestation of reliance"); *Patentas,* 687 F.2d at 717 (plaintiffs failed to show that Coast Guards inspections caused them to "forgo" other precautions against the risk of explosion).

Plaintiffs do not allege that the miners gave up their statutorily required inspections

---

**15.** An example of conduct which could prompt liability under this section is found in *National Carriers, Inc. v. United States,* 755 F.2d 675, 676 (8th Cir.1985) (FDA meat inspector, at the scene of a truck wreck, told workers not to bother separating meat contaminated by ditch water from unexposed meat, resulting in the entire load being condemned). Similarly, in this case, liability for increasing the risk would be proper had it been a MSHA inspector who lit a cigarette and caused the explosion, rather than a miner.

in reliance upon the MSHA inspectors' efforts. Nor do plaintiffs allege that Grundy abdicated its responsibility in reliance upon the MSHA inspections. In light of the clear Congressional purpose to ensure that the primary responsibility for safety remains with the mine owners and miners, 30 U.S.C. § 801(e), such reliance—even had it occurred—would have been manifestly unreasonable and unjustified. *See Moody,* 774 F.2d at 157 (reliance unreasonable where precluded by clear statutory or regulatory language); *Raymer,* 660 F.2d at 1143–44 (justifiable reliance precluded by the plain meaning of 30 U.S.C. § 801(e)).

The Supreme Court has ordinarily refused to comment on the state-law aspects of FTCA actions. *See, e.g., Varig Airlines,* 467 U.S. at 815 n. 12, 104 S.Ct. at 2765 n. 12. Early in its FTCA jurisprudence, however, the court provided three examples of proper applications of the good samaritan doctrine. *See Indian Towing Co. v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (government liable for negligent operation of a lighthouse); *United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 796 (1955) (government liable for negligence of air traffic controllers); *Rayonier v. United States,* 352 U.S. 315, 318, 77 S.Ct. 374, 376, 1 L.Ed.2d 354 (1957) (government liable for negligence in fighting fires on government land).

These cases illustrate that, except for where a government employee intermeddles in a situation and makes it worse, the good samaritan doctrine will only apply against the government in the presence of reasonable, justifiable reliance. In *Indian Towing,* the reliance of seafarers on the warnings provided by a lighthouse is self-evident. More importantly, that reliance would exist regardless of who was running the lighthouse, the government or some private individual. The reliance of pilots on accurate instructions from air traffic controllers in *Union Trust* is equally obvious and would exist whether the service was being provided by the government or a private individual. In *Rayonier,* reliance by the adjoining land owners was necessary because the government expressly assumed the duty to fight fires originating on its land and "took exclusive direction and control" of all the firefighting efforts when fire did break out. *Rayonier,* 352 U.S. at 316, 77 S.Ct. at 375.

In each of these cases, the government employees were active participants, providing services to others to which state-law, good samaritan principles would attach a duty of care. While private individuals do not routinely provide these services, such similar situations are readily imaginable and liability surely would be imposed were private individuals to engage in providing these services. Contrast these cases with cases such as the present one. In this case, the government employees are mere observers, monitoring the actions of others. The government, by express statutory language, precludes persons from relying upon this monitoring function and prevents courts from determining that the government has assumed the duty of compliance normally owed by the party whose compliance is being monitored. In these cases, absent some conduct by the government employees which affirmatively worsens the situation, the common law does not impose a duty of care upon their actions and damages from the United States may not be sought under the FTCA.

Use of this actor/monitor dichotomy, we believe, would be useful in dismissing inappropriate cases without having to resort to the sort of minute analysis, both of the FTCA's exceptions and of the hypothetical state-law liability for private, non-contractual "inspectors," as we have undertaken in this case.

Because we hold that plaintiffs have failed to plead, and the record fails to show, any justifiable, detrimental reliance, we hold that plaintiffs may not proceed under Restatement § 324A(c).

## C.

Accordingly, because plaintiffs' complaints do not allege facts sufficient to support state-law liability for a similarly situated "private individual" under either the negligence per se or good samaritan doctrines, we hold that the requirements of 28 U.S.C. § 2674, have not been met and, therefore, plaintiffs' com-

plaints were properly dismissed for lack of subject matter jurisdiction.

### IV.

The greatest limitation upon the government's liability under the FTCA is not, and was not intended to be, the discretionary function exception. Rather, the principle limitation is that, for the government to be liable, state law must provide for private liability under similar circumstances. Where no similar circumstances exist or can even be imagined, or where private individuals would not be held liable even under similar circumstances, the government is not liable under the FTCA.

Relying upon the discretionary function exception to limit liability in cases such as this distorts the scope of that exception by stretching it to meet facts for which it was not intended. Moreover, it encourages litigation as plaintiffs search diligently through agency regulations, manuals and memoranda in search of some restriction on discretion. Finally, it improperly discourages a regulatory agency from defining for itself the standard of conduct it expects of its employees, lest those standards be turned against it in future litigation. All this, simply because courts seek to avoid the threshold, "state law" question by assuming some general duty of care.

Cases against regulatory agencies based solely on an alleged "failure to prevent" are unique within the FTCA. These are not situations in which a private person's participation can be readily imagined, such as running a lighthouse or an airport control tower or fighting fires. These are situations in which *only* governments can find themselves and, therefore, ordinary state-law principles of private liability do not, and cannot, apply.

The two state-law doctrines relied upon by plaintiffs, even when applied in their most basic, most forgiving formulation, do not provide for the comparable private liability which the FTCA requires. Where Congress has intended to compensate harm in these areas, it has expressly provided a right of action under the relevant regulatory scheme.

Where Congress has not so acted, the FTCA is not a proper substitute.

### V.

For the reasons stated above, the district court's decision to grant the Government's motions to dismiss in these cases is **AFFIRMED.**

RALPH B. GUY, Jr., Circuit Judge, concurring.

I concur in the result reached by Judge Suhrheinrich, except I would not reject the concept of a "discretionary function" analysis leading to the same conclusion. Like Judge Suhrheinrich, I do not think Congress ever intended the FTCA to be an invitation to parse the rules and regulations of regulatory agencies looking for those functions the agencies arguably were required to perform, and then attempting to have liability follow those functions. When Congress passes statutes and delegates their enforcement to a federal agency, the agency, of course, has no discretion whether to enforce or not. To equate this lack of discretion with waiver of immunity, however, is to miss the point of the discretionary function exception provided by Congress in the FTCA.

Also, like Judge Suhrheinrich, I would prefer an analysis that provided something closer to a bright line test. Here, for example, we have injured miners, whose injuries were the result of their employer's negligence. It is not difficult to sort out the injured from those responsible. By passing mine safety regulations, the federal government is not substituting itself for the mine owners or assuming their responsibilities.

The very essence of the federal function is to evaluate the mine owner's compliance with the applicable regulations and then, if noncompliance is noted, to impose some type of remedial course of action to be enforced by the imposition of sanctions if necessary. In short, the government agents are making judgment calls on what is wrong and how to correct it. This, for me at least, equates to the exercise of discretion.