William ASHLEY, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 97–2260–Bre.

United States District Court, W.D. Tennessee, Western Division.

Dec. 23, 1997.

William Ashley, pro se.

Brian Quarles, Assistant U.S. Attorney, Memphis, Tennessee, for defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

BREEN, United States Magistrate Judge.

Before the court is the motion of the government to dismiss plaintiff's complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure or, in the alternative, for summary judgment under Fed.R.Civ.P. 56. For the following reasons, defendant's motion is GRANTED.

The following facts are undisputed. At the time of the actions from which this claim arose, plaintiff, William Ashley, was a prisoner incarcerated at the Federal Correctional Institution at Memphis, Tennessee ("FCI—Memphis"). On October 20, 1995, an inmate riot occurred at the facility. The next day, the personal property of inmates, including plaintiff, was removed from cells by corrections officers. On October 22, plaintiff was transferred to a federal prison facility in Terre Haute, Indiana. Ashley received part of his personal property on December 21, 1995. On April 15, 1996, plaintiff filed a tort claim with the U.S. Bureau of Prisons ("BOP"), seeking $755.65 for damaged and missing personal property. The claim was denied on October 15, 1996. Ashley filed the instant *pro se* lawsuit on March 28, 1997

pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671, *et seq.* ("FTCA").

▪ In its motion to dismiss, defendant first argues that this court lacks subject matter jurisdiction over plaintiff's claim. Motions to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) fall into two categories: facial and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.), *cert. denied*, 513 U.S. 868, 115 S.Ct. 188, 130 L.Ed.2d 121 (1994). A facial attack challenges the sufficiency of the complaint itself. *Id.* A factual attack, on the other hand, challenges the factual existence of subject matter jurisdiction. In analyzing such motions, the court must determine whether the pleading sets forth allegations sufficient to show that the court has subject matter jurisdiction. There is no presumption that the factual allegations set forth in the complaint are true and the court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Id.* The court has wide discretion to consider materials outside the complaint in assessing the validity of its jurisdiction. *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir.1990). The plaintiff bears the burden of demonstrating subject matter jurisdiction. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Where a factual controversy exists, the court must "weigh the conflicting evidence to arrive at the factual predicate that subject matter jurisdiction exists or does not exist." *Ohio Nat'l Life Ins. Co.*, 922 F.2d at 325.

▪ Defendant bases its assertion of lack of subject matter jurisdiction on the grounds that the actions of the employees of FCI—Memphis qualified for the discretionary function exception to the FTCA. The FTCA "does not create a cause of action against the United States." *Myers v. United States*, 17 F.3d 890, 894 (6th Cir.1994). Rather, the statute grants a limited waiver of sovereign immunity

for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The waiver does not, however, extend to

[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). When a case falls within the discretionary function exception, the court lacks subject matter jurisdiction. *Rich v. United States,* 119 F.3d 447, 450 (6th Cir.1997) (citing *Feyers v. United States,* 749 F.2d 1222, 1225 (6th Cir.1984), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985)).

██ In order to determine whether the exception is applicable, the court must engage in a comparatively rigid two-step analysis. First, the court must decide if the "authority under which the action was taken allowed the actor discretion to choose from among alternative courses of action." *Myers,* 17 F.3d at 895 (citing *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988)). "[C]onduct cannot be discretionary unless it involves an element of judgment or choice." *Berkovitz,* 486 U.S. at 536, 108 S.Ct. at 1958 (citing *Dalehite v. United States,* 346 U.S. 15, 34, 73 S.Ct. 956, 967, 97 L.Ed. 1427 (1953)). The exception should not be applicable if a federal statute, regulation or policy exists which specifically prescribes a course of action

for the employee. *Id.* If no such prescription is present, the employee must exercise judgment, which should be protected. *Id.* If the first condition is satisfied, the court must then determine whether the actor is "authorized to make those choices on the basis of "social, economic, or political policy." *Myers,* 17 F.3d at 895. That is, is the actor authorized to set policy or does he merely implement, under objective criteria, the policy decisions of others? *Id.* The purpose of the discretionary function exception to the FTCA is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 2764–65, 81 L.Ed.2d 660 (1984).

██ According to an internal incident report provided to Mark Luttrell, Warden of FCI—Memphis, the Special Investigative Supervisor (SIS) received confidential information from October 18 through 20, 1995 indicating that inmates at the facility, which held approximately 905 prisoners, had expressed interest in the upcoming congressional vote on the disparity between mandatory sentencing guidelines for possession of crack and powder cocaine. When it was reported on October 19 that Congress had voted to maintain current guidelines, the SIS obtained information that the inmate population had planned a peaceful protest in the form of a work stoppage on October 23. Shortly after noon, inmates began setting fires throughout the institution, breaking windows, running on the compound in large groups, brandishing weapons, assaulting prison staff, and seizing staff keys with which they opened cells. At the time of the riot, plaintiff was working in the prison's UNICOR factory. Prison officials regained control of the facility early the following morning but did not remove the institution from lockdown status until November 8. The plaintiff himself states in his complaint

that a "riot" occurred at the facility on October 20, 1995.

As a result of the incident, two inmate housing units, including the Delta unit where plaintiff's cell was located, were burned and damaged beyond use. Luttrell stated in an affidavit that he instructed prison staff to handcuff the inmates, who were placed in the prison gymnasium, chapel, special housing unit, detention center, and UNICOR factory. Some inmates were put on buses in the recreation yard and others, who were determined to be nonparticipants, were moved to Arkansas unit. Still other inmates were transferred to the Tennessee, Shelby, and Beale units, which were still usable. In his response to defendant's motion, plaintiff states that, in the predawn hours of October 21, he and other UNICOR workers were escorted by prison staff to Arkansas unit.

In an effort to maintain internal security and control and prevent contraband and weapons, Luttrell further stated that he instructed prison staff to remove all trash, contraband, government property, and inmate personal property from the housing units. Personal property bagged by inmates and carried from the housing units on the day of the disturbance had been secured in the prison chapel. All personal property remaining in the housing units on October 22 was to be removed by prison staff and secured. In his affidavit, corrections officer Cedric Roby stated that staff was instructed to gather all government issued property from the cells and place it in the common area of the unit for removal. Inmate property was bagged by cell, with a notation of the unit and cell number inside. The bags were taped closed and secured. Inmates were notified that they would have the opportunity to identify their property, which would be returned to them. Certain items, which prison officials determined would not be permissible inmate personal property in the aftermath of the disturbance, could be mailed at government expense to the destination of the inmate's choice. In the days immediately following the riot, almost 300 inmates, including plaintiff, were transferred to other federal correctional institutions.

Plaintiff claims that, on October 22, he was taken from Arkansas unit to the prison's receiving and discharge area, where his glasses and debit card were taken from him. He was airlifted to Oklahoma and then redesignated to FCI—Terre Haute. He further alleges that he overheard Roby tell inmates on the day following the riot that he "raked inmates property out of there (sic) lockers into a bed sheet, wrote the inmates name on the sheet and threw it out into the center of the floor." (Pl.'s Compl. at 2.) Plaintiff, who lived on the top tier of cells, claims that a laundry list of personal items, including food, toiletries, personal papers, magazines, and photographs, were lost. He further argues that he was asked by a corrections officer to assist in cleaning out cells and refused to do so.

Thus, the nature of the conduct upon which plaintiff bases his claim consists of the failure of the warden of FCI—Memphis to take adequate measures to ensure that inmate personal property was secured during a disturbance which even plaintiff characterized as a riot. The Supreme Court has held that the "nature of the conduct, rather than the status of the actor, ... governs whether the discretionary function exception applies." *Varig Airlines,* 467 U.S. at 813, 104 S.Ct. at 2764. The discretionary function exception does not apply if there is a federal statute, regulation, or policy mandating certain conduct. The BOP has a general statutory duty to "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses." 18 U.S.C. § 4042(a)(2). The agency is also required by regulation and policy to follow certain procedures in the handling of contraband (28 C.F.R. § 553.13) and in the routine movement of personal property of inmates arriving at the facility, transferring to other institutions, and being discharged into the community (BOP P.S. 5580.02 Inmate Personal

Property). The warden of FCI—Memphis certified in his affidavit, and the plaintiff does not dispute, that no statute, regulation, or policy exists which governs the administration of inmate personal property in a riot situation.

In *Buchanan v. United States,* 915 F.2d 969, 971 (5th Cir.1990), the Fifth Circuit noted that "no statute, regulation, or policy does, or indeed could, specifically prescribe a course of action for prison officials to follow in every prison uprising." A "prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." *Rhodes v. Chapman,* 452 U.S. 337, 349 n. 14, 101 S.Ct. 2392, 2400 n. 14, 69 L.Ed.2d 59 (1981). "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447, 474 (1979). When the potential for violence ripens into actual unrest and conflict, the Court's admonition in *Rhodes* carries special weight. *Whitley v. Albers,* 475 U.S. 312, 321, 106 S.Ct. 1078, 1085, 89 L.Ed.2d 251 (1986). "Prison officials' minute-to-minute decision making in the chaotic circumstances of a riot is a classic example of an activity requiring the exercise of discretion." *Buchanan,* 915 F.2d at 972.

Therefore, while the broad statutory duty of the BOP in providing for the safety of inmates and the policies outlining the administration of inmate personal property on a routine basis is not discretionary, the manner in which the warden of an individual facility fulfills his duties with regard to inmate property in response to a riot situation is. It is clear that balancing the need to regain control of the facility and maintain the safety of inmates and staff with the administration of inmate personal property involved considerations of public policy. The fact that some inmate personal property was no doubt lost or damaged in the mayhem, either by marauding fellow inmates, by the fire which engulfed plaintiff's housing unit, or through the negligence of corrections officers in its aftermath, does not take the decisions and actions of the warden outside the ambit of the exception. *See Castor v. United States,* 883 F.Supp. 344, 353 (S.D.Ind.1995) (BOP's decisions concerning asbestos at prison facility, even if negligent, clearly within the spectrum of matters protected under the exception).

Attached to the plaintiff's response to defendant's motion is the affidavit of Jamie T. Lair, dated February 18, 1996, which asserts that little or no effort was made to identify inmates' property following the riot at FCI—Memphis. Lair further contends that dump trucks were used to remove items from the prison and that some inmates were permitted to take items from "piles of commissary" at the jail. Finally, the witness makes an unconfirmed assertion that he later saw staff members eating commissary items which they obviously had not purchased and others were listening to radios which appeared to be ones owned by inmates. Other than these statements, plaintiff's only allegations in his complaint referencing some involvement in the post-riot cleanup by prison officials were those concerning Officer Roby. Ashley then concludes with a statement that defendant's employees caused the destruction of his personal property.

In the government's motion, several affidavits are included outlining various responsibilities of the prison officials both during and following the riot. Officer Roby does not contest that inmate orderlies were utilized to remove government issued property from the cells or that inmate property was taken, placed in bags and tagged for identification. Furthermore, Roby admits that he operated a forklift to remove and transport trash from the housing units during the cleanup following the riot. Thus, there is not a significant factual disparity about how FCI—Memphis employees went about cleaning up the facility, including securing the inmates' property and otherwise disposing of those items destroyed as a result of the disturbance.

Although the actions of the prison officials during the hours and days after the destruction at FCI—Memphis may not have comported with the procedures utilized during the normal transfer of prisoners, this operation was not normal procedure. The guards and those who worked with them had to employ some discretion in less than optimum conditions to bring normalcy back to the prison facility. This court will not second guess the way in which the cleanup was conducted. Plaintiff has not presented any credible factual arguments which would convince the court that a factual predicate exists on which to base subject matter jurisdiction under the FTCA. Moreover, the fact that much of plaintiff's property was recovered and turned over to him illustrates a good faith effort on the part of FCI—Memphis officials to return what property they could. Therefore, the court concludes that the discretionary function exception to liability under the FTCA is applicable to this case.

Accordingly, defendant's motion to dismiss or, in the alternative, for summary judgment is GRANTED on the grounds that this court lacks subject matter jurisdiction.